UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:

                                           CASE NO. 8:19-bk-10111-MGW

SUMMIT VIEW, LLC                              Chapter 11

       Debtor.

_____/

JANET DENLINGER and
HARRY DENLINGER,

       Plaintiffs,                              Adv. Case No. 8:19-ap-00610-MGW

vs.

SUMMIT VIEW, LLC; THE CITY OF DADE CITY;
MICHAEL SHERMAN as Dade City Community
Development Director; KEENE SERVICES, INC.
THE SOUTHWEST FLORIDA WATER MANAGEMENT
DISTRICT; BRIAN ARMSTRONG as the Southwest
Florida Water Management District Executive Director;
and FLORIDA DESIGN CONSULTANTS, INC.

       Defendants.

_____/

**NOTICE OF FILING PROPOSED COMPETING ORDERS SUBMITTED TO THE
STATE COURT IN CONNECTION WITH A HEARING HELD ON JUNE 14, 2019**

      SUMMIT VIEW, LLC, ("Debtor"), by and through its undersigned counsel, hereby files

true and correct copies of two competing proposed Orders on Motions Heard June 14, 2019 in

the case of *Denlingers v. Summit View, LLC*, *et al.* submitted by (1) Thomas P. Scarritt, Jr. on or

about July 22, 2019 and (2) Joseph F. Southron, Esq. on or about July 23, 2019 to the Honorable

Susan G. Barthle, Pasco County Judge.  Word versions of both orders have also been submitted

to chambers by Debtor's counsel via email to Ed_Comey@flmb.uscourts.gov.

      The Debtor also files the attached hearing transcript from the hearing held on June 14,

2019 before Judge Barthle.

## **CERTIFICATE OF NECESSITY**

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Filing has been furnished by the Court's CM/ECF System or by regular U. S. Mail to the U.S. States Trustee, 501 E. Polk St., Ste. 1200, Tampa, FL 33602; Summit View, LLC, Attn: Douglas J. Weiland, 334 East Lake Road., Ste. 172, Palm Harbor, FL 34685; **John J. Lamoureux**, Carlton Fields, PA, PO Box 3239, Tampa, FL 33601; **Joseph Southron**, Four Rivers Law PLLC, 400 N. Ashley Dr., Ste. 1900, Tampa, FL 33602; and **J. Michael Shea**, 6301 Bayshore Blvd., Tampa, FL 33611 on February 7, 2020.

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

/s/ Alberto F. Gomez, Jr.
Alberto F. Gomez, Jr. (FBN: 784486)
401 East Jackson Street #3100
Tampa, FL 33602
Telephone:    813-225-2500
Facsimile:    813-223-7118
Email: Al@jpfirm.com
Attorneys for Debtor

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, STATE OF FLORIDA
CIVIL DIVISION

JANET DENLINGER and
HARRY DENLINGER,

        Case No.: 2018-CA-001241

        Plaintiffs,

        Division:  D

v.

DOUGLAS J. WEILAND,
ELIZABETH C. SIRNA,
SUMMIT VIEW, LLC.,
CWES III, LLC,
THE CITY OF DADE CITY,
MICHAEL SHERMAN in his
Capacity as Dade City Community
Development Director,
THE SOUTHWEST FLORIDA WATER
MANAGEMENT DISTRICT, and
BRIAN ARMSTRONG in his Capacity
as the Southwest Florida Water
Management District Executive Director,

        Defendants.

                                  /

## ORDER ON MOTIONS HEARD JUNE 14, 2019

THIS CAUSE COMING TO BE HEARD on June 14, 2019, on the following motions:

1.    Defendants City of Dade City's and Michael Sherman's Amended Motion to Dismiss Plaintiffs' Second Amended Complaint and Motion to Strike Plaintiffs' Claim for Attorney's Fees, dated 1/21/19 ("Dade City's and Mr. Sherman's Motion");

2.    Defendants Southwest Florida Management District's and Brian Armstrong's, in his Capacity as the Southwest Florida Management District's Executive Director, Motion to Dismiss Plaintiffs'; Second Amended Complaint or in the Alternative Motion for More Definite Statement, dated 1/4/19 ("SWFWMD's and Mr. Armstrong's Motion");

3.    Defendant Summit View, LLC's Motion to Dismiss Second Amended Complaint and Strike Demand for Attorney's Fees and Legal Argument, dated 2/7/19 ("Summit View's Motion");

Plaintiff's Proposed Order

4.    Defendant, Keene Services, Inc.'s Motion to Dismiss Second Amended Complaint with Supporting Memorandum of law, dated 1/18/19 ("Keene Services' Motion").

THE COURT, having reviewed the above-listed motions, having reviewed supporting and opposing memoranda, having heard argument of counsel, and otherwise being duly advised in the premises, does hereby rule and order for the reasons the Court stated at the hearing on June 14, 2019.

## I.    AS TO DADE CITY'S AND MR. SHERMAN'S MOTION

1.    Count 6 of the Second Amended Complaint is dismissed with prejudice against Dade City and Mr. Sherman.

2.    Count 7 of the Second Amended Complaint is dismissed without prejudice against Dade City and Mr. Sherman.

3.    Count 8 of the Second Amended Complaint is dismissed without prejudice against Dade City and Mr. Sherman.  See Florida Statutes § 768.28.

4.    Dade City's motion to strike Plaintiffs' claim for attorney's fees in Count 8 of the Second Amended Complaint is denied as moot in light of Plaintiffs' representation that such claims has been removed from the proposed third amended complaint.

## II.    AS TO SWFWMD'S AND MR. ARMSTRONG'S MOTION

1.    Count 5 of the Second Amended Complaint is dismissed with prejudice against SWFWMD and Mr. Armstrong.  See Florida Statutes §373.617.

2.    Count 7 of the Second Amended Complaint is dismissed without prejudice against SWFWMD.

3.    Count 8 of the Second Amended Complaint is dismissed with prejudice against SWFWMD.  See Florida Statutes §373.443(1) and Florida Statutes §768.28.

### III.    AS TO SUMMIT VIEW'S MOTION

1.      Count 1 of the Second Amended Complaint is dismissed with prejudice.

2.      Count 2 of the Second Amended Complaint is dismissed without prejudice.

3.      Count 9 of the Second Amended Complaint is dismissed without prejudice.

4.      Count 10 of the Second Amended Complaint is dismissed without prejudice.

5.      Summit View's motion to strike Plaintiffs' Claims for Attorney's Fees and Punitive Damages is denied as moot in light of Plaintiffs' representation that those claims have been removed from the proposed third amended complaint.

### IV.    AS TO KEENE SERVICES' MOTION

1.      Count 4 of the Second Amended Complaint is dismissed without prejudice.

2.      Count 9 of the Second Amended Complaint is dismissed without prejudice.

3.      Count 10 of the Second Amended Complaint is dismissed without prejudice.

### V. PLAINTIFFS' MOTION TO AMEND

Plaintiffs' may amend the Second Amended Complaint by filing a third amended complaint, consistent with the above rulings, is granted. The third amended complaint may include those counts which the Court has dismissed without prejudice. The third amended complaint need not (and should not) allege the counts which have been dismissed with prejudice in order to preserve them for a motion for rehearing or for appeal.

Plaintiffs' may file the third amended complaint within ____ days of the date of this order.

**DONE AND ORDERED** in Chambers, Dade City, Pasco County, Florida, this ___ day of _____, 2019.

_____
HONORABLE SUSAN G. BARTHLE
CIRCUIT COURT JUDGE

Copies to
All Counsel of Record

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, STATE OF FLORIDA
CIVIL DIVISION

JANET DENLINGER and HARRY
DENLINGER,

       Plaintiffs,

v.

SUMMIT VIEW, LLC, THE CITY OF
DADE CITY, MICHAEL SHERMAN in
his Capacity as Dade City Community
Development Director, THE
SOUTHWEST FLORIDA WATER
MANAGEMENT DISTRICT, BRIAN
ARMSTRONG in his Capacity as the
Southwest Florida Water Management
District Executive Director, KEENE
SERVICES, INC. and FLORIDA DESIGN
CONSULTANTS, INC.,

       Defendants.

_____/

CASE NO:
2018CA001241CAAXES

### <u>ORDER ON MOTIONS HEARD JUNE 14, 2019</u>

This cause came on for hearing in open court on June 14, 2019 upon the following

motions:

1.    Defendants the City of Dade City and Michael Sherman's Amended Motion
to Dismiss Plaintiff's Second Amended Complaint and Motion to Strike Plaintiff's
Claim for Attorney's Fees, dated 1/22/19;

2.    Defendants Southwest Florida Water Management District's and Brian
Armstrong's, in his Capacity as the Southwest Florida Water Management District's
Executive Director, Motion to Dismiss Plaintiff's Second Amended Complaint or in
the Alternative Motion for More Definite Statement, dated 1/4/19;

3.    Defendant Summit View, LLC's Motion to Dismiss Second Amended
Complaint and Strike Demand for Attorney's Fees and Legal Argument, dated 2/7/19;

4.    Defendant, Keene Services, Inc.'s Motion to Dismiss Second Amended

Defendants' Proposed Order

Complaint with Supporting Memorandum of Law, dated 1/8/19.

## I. <u>DEFENDANTS CITY OF DADE CITY</u><br><u>AND MICHAEL SHERMAN</u>

1. Plaintiffs request attorneys' fees in Count 8 (Negligence) against the City of Dade City ("City"). "Attorney's fees incurred while prosecuting or defending a claim are not recoverable in the absence of a statute or contractual agreement authorizing their recovery." <u>Bidon v. Dep't of Prof'l Regulation</u>, 596 So.2d 450, 452 (Fla. 1992); <u>Dade County v. Pena</u>, 664 So.2d 959, 960 (Fla. 1995).

2. Plaintiff's Counsel conceded this Motion at the beginning of the hearing and thus the Court **grants the City's Motion to Strike Plaintiffs' Claim for Attorney's Fees with prejudice**.

3. Plaintiff's Second Amended Complaint alleges a claim under Count 6 for a Writ of Mandamus against the City. The required elements for pleading a Writ of Mandamus are: (1) the petitioner has a clear and certain legal right (2) to the performance of a particular duty (3) by a government or a representative of the government (4) whose performance of that duty is ministerial and not discretionary (5) who has failed to perform despite an adequate request, and (6) who has left the petitioner with no other legal method for obtaining relief. <u>See, Huffman v. State</u>, 813 So. 2d 10 (Fla. 2000); <u>Pino v. District Court of Appeal, Third Dist.</u>, 604 So. 2d 1232 (Fla. 1992); <u>Caldwell v. Estate of McDowell</u>, 507 So. 2d 607 (Fla. 1987).

4. After reading Plaintiffs' Second Amended Complaint and listening to arguments at the hearing, the Court concludes as a matter of law that Plaintiffs have not and cannot allege a clear and certain legal right, and that the legal relief sought is purely discretionary, rather than ministerial. No amendment of this Count can render it legally viable. Consequently, **Count 6 against the City and Mr. Sherman is dismissed with prejudice.**

2

5.  Count 7 attempts to allege inverse condemnation against Dade City based upon the City's zoning approvals issued to Defendant Summit View, LLC on January 10, 2006. Second Amended Complaint at ¶ 32. The Court notes that Florida Statute §373.617 (2) provides that any person affected by the final action of any "agency" (defined as a "unit or entity of state government") with respect to a permit may seek review within 90 days of the rendering of such decision.

6.  The pleadings are clear that Plaintiffs failed to seek timely review of the 2006 governmental decision. However, in an abundance of caution, the Court will allow amendment on that Count. Therefore the **Count 7 is dismissed without prejudice**.

7.  Plaintiffs attempt to allege negligence in Count 8 against Dade City for issuing permits to Summit View for a construction project that Plaintiffs contend has damaged their property. The City argues persuasively that the notice provisions of Florida Statute §768.28 were not fulfilled as the Plaintiffs failed to present their claim in writing to the City and the Department of Financial Services within three years of accrual of the claim. Florida Statute §768.28 (a). The City correctly states that the notice required under the statute is a condition precedent to maintaining a lawsuit. Florida Statute §768.28 (6)(b); <u>Commercial Carrier Corp. v. Indian River County</u>, 371 So. 2d 1010, 1022-1023 (Fla. 1979). Finally, the City accurately argues that Plaintiffs' failure to provide notice robbed it of the opportunity to conduct the six-month investigation to which it is entitled under the statute. Florida Statute §768.28 (6)(c).

8.  Plaintiffs argued at the hearing (but have not yet pled) that their negligence claim did not accrue until 2018. The Court will allow an amendment of Plaintiffs' negligence claim against the City based on that legal argument. Accordingly, **Count 8 is dismissed without prejudice**.

## II.  DEFENDANTS SOUTHWEST FLORIDA WATER  MANAGEMENT DISTRICT AND BRIAN ARMSTRONG

9.  In Plaintiffs' Second Amended Complaint, they have alleged Count-5 Writ of Mandamus against the Southwest Florida Water Management District ("District") and Mr. Armstrong. This Court finds that Plaintiffs have failed to establish a clear legal right to the performance of a ministerial duty by the public officer or agency. Miami-Dade County Bd. Of County Commissioners v. An Accountable Miami-Dade, 208 So.3d 724, 730 (Fla. 3d DCA 2016). The Court further finds that Plaintiffs cannot use a Writ of Mandamus to establish the existence of the right itself. Florida League of Cities v. Smith, 607 So.2d 397, 400-401 (Fla. 1992). For these reasons, **Count 5 is dismissed with prejudice as to the District and Mr. Armstrong.**

10. In Plaintiffs' Second Amended Complaint, they have alleged Count 7-Inverse Condemnation against the District. Count 7 is based on the issuance of the 2006 Environmental Resource Permit (ERP) to Summit View, LLC. The Court finds that Section 373.617(2), Florida Statutes, requires that a claim asserting that the issuance of the ERP is a taking without just compensation be filed within 90 days of the District's issuance of the ERP. Plaintiffs did not file a claim for taking within 90 days of the District's issuance of the ERP and, for this reason, **Count 7 is dismissed without prejudice as to the District.**

11. In Plaintiffs' Second Amended Complaint, they have alleged Count 8- Negligence against the District. Section 373.443(1), Florida Statutes, bars an action against the District for the partial or total failure of a stormwater management system by virtue of the approval of an ERP. Further, Plaintiffs' claim against the District is barred by the doctrine of sovereign immunity. §768.28, Fla. Stat.; Commercial Carrier v. Indian River County, 371 So.2d 1010,

1020 (Fla. 1979); Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So.2d 912 (Fla.

1985); and Thompson v. Dept of Highway Safety and Motor Vehicle, 692 So.2d 272 (Fla. 5th

DCA 1997). For these reasons, **Count 8 is dismissed with prejudice as to the District.**


## III.  DEFENDANT SUMMIT VIEW, LLC

12. The Second Amended Complaint alleges four claims against Defendant Summit View, LLC

("Summit View") arising from excavation on Summit View, LLC's real property:

(1) fraudulent inducement (Count 1); (2) negligence (Count 2); (3) deprivation of lateral

support for damages (Count 9); (4) deprivation of lateral support for injunctive relief (Count

10).  Each of these causes of action suffers from defects which require dismissal.

13. Count 1 for fraudulent inducement fails to allege a false statement of a material fact, causation

or a claim accruing within the applicable statute of limitations. Summit View, LLC's alleged

promise or expressed intent to do something in the future does not state a claim for fraudulent

inducement. See Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So. 2d 251,

255 (Fla. 3d DCA 2005 (dismissing fraudulent inducement claim, with prejudice, where

"plaintiffs made no specific allegations of misrepresentation of material facts" and, at best,

"alleged a mere promise not performed, which, by itself, cannot form the predicate for

actionable fraud"); *Brod v. Jernigan,* 188 So. 2d 575, 579 (Fla. 2d DCA 1966). Count 1 also

fails to plead facts showing how Plaintiffs' reliance caused injury. See Lance v. Wade, 457

So. 2d 1008, 1011 (Fla. 1984); Robertson v. PHF Life Ins. Co., 702 So. 2d 555, 556 (Fla. 1st

DCA 1997), *rev. denied,* 717 So. 2d 537 (Fla. 1998). Further, the alleged fraud occurred by

January 10, 2006, when Dade City and the District approved the rezoning and removal of dirt

from the subject property.  Second Amended Complaint at     22-23, 81.  Summit View's

5

subsequent removal of dirt allegedly was "conspicuous," "obvious" and so "fully incompatible with the supposed subdivision," that it set off "alarming signals." Id. at ¶¶ 37-39. The permits Summit View obtained to remove dirt from its property are public documents accessible with due diligence from Dade City, the District and Pasco County. Id. at ¶¶ 4, 9, 39-46, 49, 67. Despite the "conspicuous," "obvious" "alarming signals" allegedly coming from the neighboring property, Plaintiffs did not file a fraud claim against Summit View until 2018, outside the four-year statute of limitations provided by Section 95.1193)(j), Florida Statutes. **Count 1 is dismissed with prejudice.**

14. Count 2 fails to state a negligence claim because it does not allege cognizable damages or identify when the tortious conduct and harm allegedly occurred. The Second Amended Complaint alleges the excavation on the subject property merely has "the *potential* of causing soil from the Denlingers' land to slide into Summit-View." Id. at ¶¶ 2, 96, 115,  172 (emphasis added); see Taylor Imported Motors, Inc. v. Smiley, 143 So. 2d 66, 67 (Fla. 2d DCA 1962). **Count 2 is dismissed without prejudice.**

15. Counts 9 and 10, common law claims for deprivation of lateral support, allege "the *potential* of causing soil from the Denlingers' land to slide into Summit-View," but fail to allege a substantial subsidence or whether any subsidence occurred within the statute of limitations. See Levi v. Schwartz, 201 Md. 575 95, A. 2d 322, 36 A.L.R.2d 1241 (Md. 1953)(citing Restatement (Second) Torts § 817 Comment i). **Counts 9 and 10 are dismissed without prejudice.**

16. Plaintiffs failed to obtain Court authorization to assert their claims for exemplary damages in Counts 1 and 2, as required by Section 768.72, Florida Statutes. Plaintiffs allege no statutory or contractual basis to support their demand for the recovery of their attorneys' fees. **Summit**

**View's Motion to Strike Plaintiffs' Demand for Attorneys' Fees is granted.**


## IV.  DEFENDANT KEENE SERVICES, INC.

17. The Second Amended Complaint alleges three claims against Defendant Keene Services, Inc. arising from excavation on Summit View, LLC's real property: (1) negligence (Count 4); (2) deprivation of lateral support for damages (Count 9); and (3) deprivation of lateral support for injunctive relief (Count 10). Each of these causes of action suffers from defects which require dismissal.

18. Count 4 fails to state a negligence claim because it does not allege cognizable damages or identify when the tortious conduct and harm allegedly occurred. The Second Amended Complaint alleges the excavation on the subject property merely has "the *potential* of causing soil from the Denlingers' land to slide into Summit-View." Id. at ¶¶ 2, 96, 115,   172 (emphasis added); see Taylor Imported Motors, Inc. v. Smiley, 143 So. 2d 66, 67 (Fla. 2d DCA 1962). **Count 4 is dismissed without prejudice.**

19. As to Counts 9 and 10, those counts are dismissed against Defendant Keene Services, Inc., for the same reasons stated in paragraph 15 above. **As previously stated, Counts 9 and 10 are dismissed without prejudice.**


## V.  PLAINTIFFS' MOTION TO AMEND

20. Plaintiffs filed their Second Amended Complaint on December 17, 2018; they filed their Motion for Leave to File Third Amended Complaint on March 1, 2019; and they renewed their  Motion to Amend at this hearing. The Court grants Plaintiffs' Motion to Amend, consistent with its rulings above, and Plaintiffs shall file their Third Amended Complaint no

later than forty-five (45) days from June 14, 2019.

The Court, having reviewed the file and related pleadings in this matter, having heard argument of counsel, and for good cause shown and the reasons stated above and on the record, it is hereby ORDERED and ADJUDGED:

1. Defendants City of Dade City and Michael Sherman's Amended Motion to Dismiss the Second Amended Complaint is **granted;**

**2.** Defendants City of Dade City and Michael Sherman's Motion to Strike Demand for Attorneys' Fees is **granted;**

3. Defendants Southwest Florida Water Management District and Brian Armstrong's Motion to Dismiss Second Amended Complaint is **granted**;

4. Defendant Summit View, LLC, Motion to Dismiss the Second Amended Complaint is **granted;**

5. Defendant Summit View, LLC's Motion to Strike Demand for Attorneys' Fees is **granted;**

6. Defendant Keene Services, Inc.'s Motion to Dismiss Second Amended Complaint is **granted**;

7. Count 1, 5 and 6 of the Second Amended Complaint are **dismissed with prejudice**;

8. Counts 2, 4, 7, 8, 9 and 10 of the Second Amended Complaint are **dismissed without prejudice**;

9. Plaintiffs' claim for punitive/exemplary damages is **dismissed**; and

10. Plaintiff shall have 45 days from June 14, 2019 to file a Third Amended

Complaint consistent with this Order.

Done and Ordered in chambers, Dade City, Pasco County, Florida this_____ day of

_____, 2019.

_____
HONORABLE SUSAN G. BARTHLE

Copies to All Counsel of Record

```
        IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
            IN AND FOR PASCO COUNTY, STATE OF FLORIDA
                          CIVIL DIVISION

                    CASE NO:   2018-CA-001241
                        DIVISION: Y

   JANET DENLINGER and
   HARRY DENLINGER,

                     Plaintiffs,

   vs.

   SUMMIT VIEW, LLC, a Florida limited liability
   company, CITY OF DADE CITY, a political
   subdivision of Florida, MICHAEL SHERMAN as
   Dade City Community Development Director,
   KEENE SERVICES, INC., a Florida corporation,
   SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT,
   a political subdivision of Florida,
   BRIAN ARMSTRONG as Southwest Florida Water
   Management District Executive Director, and
   FLORIDA DESIGN CONSULTANTS, INC., a
   Florida corporation,

                     Defendants.
   _____/


        HEARING BEFORE THE HONORABLE SUSAN G. BARTHLE


        DATE:              June 14, 2019


        TIME:              9:46 a.m. - 12:48 p.m.


        PLACE:             Pasco County Courthouse
                           38053 Live Oak Avenue, Room 127
                           Dade City, Florida  33523


        REPORTED BY:   Lory A. Minio, RPR
                       State of Florida
                       Notary Public

                       Pages 1 - 123
```

2

1    APPEARANCES:

2

3            JOSEPH F. SOUTHRON, ESQUIRE
             J. MICHAEL SHEA, ESQUIRE (Of Counsel)
             Four Rivers Law Firm
4            400 North Ashley Drive, Suite 2600
             Tampa, Florida  33602

5
                        Attorneys for the Plaintiffs
6

7            DARRIN J. QUAM, ESQUIRE
             Stearns Weaver Miller Weissler
8             Alhadeff & Sitterson, P.A.
             SunTrust Financial Centre, Suite 2100
9            401 East Jackson Street
             Tampa, Florida  33602

10
                        Attorney for the Defendant
11                        Summit View, LLC

12

13           VIVIAN ARENAS-BATTLES, ESQUIRE
             JAMIE B. FUSSELL, JR., ESQUIRE
             Southwest Florida Water Management District
14           7601 U.S. Highway 301 North
             Tampa, Florida  33637

15
                        Attorneys for the Defendants
16                        Southwest Florida Water Management
                          District and Brian Armstrong

17

18           THOMAS P. SCARRITT, JR., ESQUIRE
             Scarritt Law Group
19           1405 West Swann Avenue
             Tampa, Florida  33606

20
                        Attorney for the Defendants
21                        City of Dade City and
                          Michael Sherman

22

23

24

25

3

```
 1   APPEARANCES CONTINUED:

 2
             DARRYL W. JOHNSTON, ESQUIRE
 3           Johnston and Sasser, P.A.
             P. O. Box 997
 4           Brooksville, Florida  34605

 5                   Attorney for the Defendant
                       Keene Services, Inc.
 6

 7           BARBARA U. UBEROI, ESQUIRE
             Dogali Law Group
 8           401 East Jackson Street, Suite 1825
             Tampa, Florida  33602
 9
                     Attorney for the Defendant
10                     Florida Design Consultants

11
     ALSO PRESENT:
12
             THOMAS A. THANAS, ESQUIRE
13
             DOUGLAS J. WEILAND
14

15

16

17

18

19

20

21                           INDEX

22                                               PAGE

23   PROCEEDINGS                                    4
     REPORTER'S CERTIFICATE                        123
24

25
```

4

1          THE COURT:  You've got everybody on one side.

2     Is that how you want it or...

3          MS. ARENAS-BATTLES:  Plaintiff's not here.

4          THE COURT:  Oh, okay.  That's what I was

5     wondering.  Plaintiff, anybody heard from them?

6     Or --

7          MS. ARENAS-BATTLES:  They may not have gotten

8     your e-mail, because we did not get your e-mail.

9     We just happened to show up early.

10          THE COURT:  All right.  Well, my assistant

11     didn't realize that the hearing behind this one

12     settled, so we've got through to lunch if need be,

13     but -- hmm.  Dang.  It's a little before ten yet,

14     so I guess I'll go hang out and wait until they get

15     here.

16          (A recess was taken from 9:34 a.m. to

17     9:46 a.m.)

18          THE COURT:  All right.  Good morning,

19     everybody.  We're here on Case Number 2018-CA-1241,

20     Denlinger v. multiple defendants.  We're here on

21     several motions to dismiss.

22          Who wishes to begin?

23          MR. SCARRITT:  I do, Your Honor.

24          THE COURT:  All right.

25          MR. SCARRITT:  Your Honor, would you like me

1    to stand up or how would you like me --

2        THE COURT:  Well, it's going to be a long

3    morning, so I'll allow you to sit.  Just introduce

4    yourself for the record.

5        MR. SCARRITT:  Yes, ma'am.  Your Honor, my

6    name is Tom Scarritt.  I represent the City of Dade

7    City.  I'd like to introduce, if I could, the new

8    city attorney, Tom Thanas, who has just come to us

9    not long ago from Illinois, where he was both city

10   attorney, city manager and judge.  Quite a

11   combination.

12       Judge, lots of folks, not much time.  Let me

13   see if we can reach an agreement.

14       I assume the motion to strike, you have no

15   problem with that.  Do you want to remove the

16   attorneys' fees from your next complaint, so --

17       MR. SOUTHRON:  We consent to that motion.

18       MR. SCARRITT:  All right.  And the negligence

19   count, are we still contesting that?

20       MR. SOUTHRON:  Yes.

21       MR. SHEA:  No.

22       MR. SOUTHRON:  Yes, we're contesting it.

23       MR. SCARRITT:  Okay.  Thank you.

24       So Judge, we're left with three.  We've made

25   some progress there.  Three of four:  Writ of

1     mandamus, negligence, and inverse condemnation.

2          Let me start with the writ of mandamus.  First

3     of all, we -- just to be clear, we're asking the

4     Court to dismiss all three of these counts with

5     prejudices.

6          We've been at this for over a year.  This is

7     the third complaint in which they've made

8     allegations, and our contention is that they cannot

9     and will never be able to allege adequately against

10    the City.

11         Now, the bedrock of a mandamus count is that a

12    party urges the Court to enter an order compelling

13    a governmental body to perform a ministerial and

14    not a discretionary function.  That's the key.

15    Ministerial, not discretionary.

16         So if you find, by looking at the allegations,

17    that what they're asking for is anything having to

18    do with discretion by the City, then this should be

19    denied -- excuse me -- this should be granted with

20    prejudice.

21         I was trying to think of examples for the

22    Court.  Ministerial:  Let's say that you're not

23    Judge Barthle.  You're teenager Barthle, and you

24    want to go and get a driver's license.  You go

25    down, and you pay your fee.  You take your written

1   exam.  You take your driving exam.  You take your
2   eye test.  You pass everything.  You're waiting in
3   line for an inordinate amount of time, and you say,
4   "Can I have my license, please?"  And they say,
5   "No, you can't have it."  You say, "Why is that?"
6   "Because we don't like you."
7        You get a lawyer.  You file a lawsuit.  You go
8   to the judge.  You explain what happened.  You say,
9   "I want a writ of mandamus.  This is a ministerial
10  action.  All they had to do was issue the license.
11  There's nothing discretionary about it.  I've
12  passed every test.  That's a ministerial action."
13       So let's see what -- in this case, whether it
14  meets that test.  We need to go back and look at
15  these critical, factual allegations with respect to
16  this issue.  Okay.  And that is that in 2006, the
17  City granted -- I'm going to call them the Weiland
18  Group, Your Honor, but it's Summit View.  It's the
19  whole group.  It's the development group on the
20  property in question.
21       The City gave the Weiland Group a rezoning and
22  land use approval with permits to build a
23  subdivision of over 400 homes.  They gave them
24  extensions to those permits.  But this happened in
25  2006.

1    Now, it's important to know that this was a

2    public -- this was all done through public

3    hearings, okay, that the plaintiffs did not

4    participate in.  They chose not to participate.

5    And so they also -- the Weiland Group also got

6    permits from SWFWMD to excavate dirt to help build

7    the Summit View project.

8    And it's the excavation of the dirt that is

9    the -- the problem here, Your Honor.  The

10   plaintiffs' contention is that the excavation of

11   the dirt has caused their property to be -- suffer

12   a diminution in value, and that the City is somehow

13   responsible.  All right?

14   Your Honor, we've -- I want to apologize on

15   behalf of everybody here for not giving you enough

16   notebooks before this hearing, but we'll do better

17   next time.

18   THE COURT:  I'm sure you will.

19   MR. SCARRITT:  But if you -- if you have my

20   notebook, and you look at our amended motion to

21   dismiss and to strike, you see that on page 3,

22   we're talking about ministerial -- getting back to

23   the ministerial versus discretionary functions.

24   This is what the plaintiffs contend the City should

25   do.

1     They allege that the City has a violation of

2  some unknown duty because it continued to

3  facilitate Summit View's illegal mining operation

4  by subsequently issuing and extending permits,

5  zoning and extending deadlines.

6     It could not be more discretionary by issuing

7  permits, okay, which is a discretionary function,

8  and extending permits, again, discretionary

9  function.  It has to go through a process within

10  the city.  It has to be voted on by the City

11  Commission, all of which is -- involves numerous

12  different aspects of discretionary review by

13  numerous people within the city.  So it could not

14  be more discretionary.

15     Let me give you -- try to give you another

16  example.  Let's say that, Your Honor, you decided

17  to build an extension onto your house, and there is

18  a setback requirement of 2 feet.  You can't build

19  beyond that.

20     Your neighbor, who doesn't particularly like

21  you, is made aware of the fact that you want to

22  get -- you want to reduce that from 2 feet to

23  1 feet.  All right?  There's a process that you're

24  made aware of.  You choose not to participate.  The

25  variance is granted.  And then they -- the neighbor

1   sues you and the City, because they don't like it.

2        That's what's happened here.  I mean, in

3   essence, that's really what's happened here.

4        So it's not just the discretionary.  A

5   mandamus is an unusual, unusual action, and if you

6   look, Your Honor, we put in our brief, there are

7   not just one, but six different requirements to

8   obtain a writ of mandamus.  It's in paragraph 4 of

9   our motion.

10        Number one, "The petitioner has a clear and

11   certain legal right."  Well, that's what we're here

12   for, Your Honor, is for you to tell us whether they

13   have a right to tell the City how to conduct its

14   zoning processes.

15        "To the performance of a particular duty,"

16   again, we contend there's no duty, whatsoever.

17        "By a government or representative of the

18   government," we would concede that they got that

19   one, so that's one out of six.  We are a form of

20   government.

21        "Whose performance of that duty is ministerial

22   and not discretionary."  I think I've gone through

23   that in great detail.  And by the way, they never

24   even alleged that.  That's, again, the bedrock, and

25   they've never alleged that it's ministerial,

1    because they can't.  I mean, it's not.

2         Number 5, "who has failed to perform despite

3    an adequate request."  Again, haven't alleged it.

4    No factual allegations of that.

5         And here's the last one, "Who has left the

6    petitioner with no legal method for obtaining

7    relief."  Your Honor, as we sit here today, I think

8    we have eight parties?  Okay.  They've been

9    involved in, you know, collateral lawsuits.

10   They're hoping to bring in others.  This is obvious

11   that we have -- they have other methods of

12   obtaining legal relief.

13        So in any event, five of the six required

14   elements for pleading a writ of mandamus are not

15   here.

16        So let's look, though, Your Honor, at what it

17   is that they want the City to do specifically, all

18   right?  Because they're unhappy, and they want the

19   City to do something, but what is it they want them

20   to do?

21        Well, what they want them to do is found at

22   paragraph 5 of our motion, and it's in Count 6 of

23   their second amended complaint.  It says they want

24   to compel Dade City and Armstrong, our community

25   development director, to review via public hearing

1    under Florida Statute Sections 373.429, the

2    environmental resource permit granted to the

3    Weiland Group, approved under such and such permit

4    number.  And they claim that we have the authority

5    to do that under this statute.  Okay?

6        The problem is the statute doesn't apply to

7    us.  It doesn't apply to us at all, okay?  If you

8    look at paragraph 6 of our complaint, it states,

9    "The governing board or the department may revoke

10    or modify a permit," all right?  "The governing

11    board or the department."

12        All right.  Well, let's look and see how those

13    terms are defined.  And on the next page,

14    "department" means "Department of Environmental

15    Protection or its successor agency or agencies,"

16    and "governing board" means "the governing board of

17    a water management district."  We're neither.

18        So even if the City were to somehow decide

19    that they wanted to move forward on this request,

20    they have no legal authority to do so.  They are

21    urging you to sign what would be an ultra vires

22    order commanding the City to do an act which it

23    cannot do.  It only applies to the Department of

24    Environmental Protection or the governing board of

25    a water management district.  It doesn't apply in

1    any way, shape or form to the City or to

2    Mr. Sherman.

3         So, Your Honor, again, just to kind of recap,

4    they only have five of six of the requirements

5    alleged.  This is a purely discretionary act that

6    they're talking about, which is permitting and

7    granting extensions to permit, and they admit that.

8    I mean, they basically admit that.  And what

9    they're urging you to do is to enter an illegal

10   order commanding the City to do something that they

11   are not legally able to do, even if they wanted to

12   do it.

13        Your Honor, as far as negligence goes, we have

14   several arguments, but one of them is notice, and

15   one of them is the Florida Supreme Court says they

16   can't do what they're trying to do here.

17        On page 8, Your Honor, of our motion, it

18   states that the Florida Statute, Section 768.28

19   requires detailed notice to be provided to a

20   municipality before suing, and I'm sure that the

21   Court is familiar with this provision.  I won't

22   read the whole thing, but I will say -- I will

23   quote the first part.  "An action may not be

24   instituted on a claim against the state or one of

25   its agencies or subdivisions unless the claimant

1      presents the claim in writing to the appropriate

2      agency...within three years after such claim

3      accrues."

4           And then it goes on and explains specifically

5      what you've got to put in the notice letter, which

6      is the date, place of birth, social security

7      number, and then some things in there that I

8      don't -- I've never really understood, like whether

9      there are any "adjudicated penalties, fines, fees,

10     victim restitution fund," et cetera, et cetera.

11          But it's very, very specific, and they have

12     never done this.  They have provided a few letters

13     after they started suit.  Even those letters are

14     inadequate.

15          Now, here's the important thing, Your Honor.

16     It has to be done within three years.  Now, there

17     are cases that say that if you don't put in the

18     date of birth, you know, that they'll -- the courts

19     will give you some leeway.  But what the courts

20     will not give you leeway on is if you do not

21     provide it within three years.  The permit comes

22     down, it's an additional statute of limitations.

23     Now, when did all this start?  2006.

24          So I'm sure that they can try to make out

25     some, you know, allegations that there was

1    something that's happened in the last, you know,

2    three years before today that they take issue with,

3    but the majority of what they're talking about is a

4    2006 zoning approval with permits and then

5    extensions along the way, all of which happened

6    before the three-year period.  So they're out of

7    the statute of limitations on this particular

8    statute.

9         And they concede this, Your Honor.  They

10   conceded, because if you look at their response,

11   they don't say a word about this.  It's the old

12   "I'll just ignore it and hopefully it will go

13   away."  It's -- so the -- this is a condition

14   precedent to -- for the notice.  They didn't file

15   it timely, and they didn't allow for the six months

16   for the City to investigate.

17        The purpose behind 768.28 is to give the --

18   the governmental agency notice of what kind of

19   claim it is so that they can have six months to

20   investigate and perhaps settle it.  I mean, I've

21   been doing this for 36 years.  I haven't seen a lot

22   of settlements in the six months, honestly, but

23   that's the right of the governmental agency to

24   either exercise it or not.  But it's held

25   sacrosanct, because otherwise you're gutting the

1    purpose of the statute.  And they didn't do that.

2    We've never had a six-month period.

3         But none of that compares to what -- what is

4    the coup de grâce, which is the Florida Supreme

5    Court has said they can't do what they're trying to

6    do, okay?  There's no -- the Florida Supreme Court

7    has unequivocally decided that there's no liability

8    of a municipality for negligently permitting and

9    inspecting functions, okay?

10        The case is Trianon Park Condominium

11   Association v. City of Hialeah.  It's on page 10 of

12   our motion, and I will read from this because it is

13   important.  "We find that the enactment of a

14   statute giving a governmental entity the power to

15   enforce compliance with the law does not, in and of

16   itself, give individuals a new right of action that

17   previously never existed.  There is no question

18   that the legislature has the power to create such a

19   cause of action, but we find no such intent in the

20   particular act which provided for the establishment

21   of building codes in this state.

22        "We find that the enforcement of building

23   codes and ordinances is for the purpose of

24   protecting the health and safety of the public, not

25   the personal or property interests of individual

1 citizens."

2   You know, Judge, you just -- you don't get a

3 chance to have a Florida Supreme Court case right

4 on point very often, but this one is.

5   Again, the next paragraph, it's from the

6 Trianon Park case again, which is a huge case in

7 terms of municipal liability in the state.  "A

8 municipality cannot be held liable for negligently

9 failing to require the plans conform to building

10 code and negligently performing inspections."

11   Exactly what they've alleged here:  That they

12 failed to conform with building codes and

13 negligently performed inspections; that we gave

14 them the right to build; we gave them the permits

15 to build; we then extended those permits when we

16 shouldn't have.

17   And the quote again is, "The government

18 clearly has no responsibility to protect personal

19 property interests or ensure the quality of

20 buildings that individuals erect or purchase.  The

21 proper remedy for faulty construction lies in an

22 action against the contractor, developer, or

23 seller."

24   And those are the folks who are in this

25 lawsuit.  They're the ones that must be sued if

1    anyone's going to be sued, but the City cannot be

2    sued.

3         So huge problems with notice, huge problems

4    with statute of limitations, huge problems with the

5    six-month investigation period, and the Florida

6    Supreme Court says you can't do it, flat out.

7         Now, the last is inverse condemnation, and I

8    am going to be very candid with you, Judge, in

9    telling you that this is not as clear as the other

10   two.  And the reason is because by inference -- we

11   don't have a case directly on point.  By inference,

12   it stands to reason that Florida law does not allow

13   a suit by a neighboring planner against the City

14   for inverse condemnation due to approvals and

15   permits that were given to a permitting landowner.

16   The guy next door, all right?

17         We've looked.  We've scoured the -- you know,

18   the legal cases, and we couldn't find one in

19   Florida that says exactly that.  But they didn't

20   either.  However, there is one that I will admit

21   gives me some pause, and that is this case, it's

22   Hillsborough County v. Gutierrez.  It's a strange

23   case.  It's a Tampa case, Second DCA 1983, in which

24   landowners -- the landowner has sued the City

25   for --

1        THE COURT:  Mr. Scarritt, just for those Tampa

2   lawyers, we do not make fun of the 13th -- if we

3   do, it's all in jest.  We're very good friends with

4   the 13th, so just had to get that on the record.

5   We love them over there.  It's just a longstanding,

6   I think, thing that we do.  I had a lawyer recently

7   tell me, "Do you guys really make fun of the 13th?"

8   No.  Never.  No.  No.  Some -- some in jest here

9   and there, but no.  We love you guys.  Go ahead.

10        MR. SCARRITT:  Your Honor, thanks for not only

11   telling us that, but putting it on the record.  I

12   may have to quote you to some other judges up here,

13   but in any event...

14        Yes, so it's -- it's a case where there is a

15   landowner who had an adjoining landowner, and the

16   County was responsible for assuring that a drainage

17   plan would work effectively for the disposal of

18   surface drainage water, okay?

19        The drainage plan was not followed.  Again,

20   that's not -- not our facts here, but the drainage

21   plan was not followed, and it ended up impeding

22   natural water flow.  There was damage that was

23   catastrophic, and they have -- the judge allowed

24   them to go forward against the County.

25        I think we have a mention of it, though, in

1   another case.  What was the other case?

2        MS. ARENAS-BATTLES:  Middle District.

3        MR. SCARRITT:  Yeah.  We looked to see.  We

4   Shephardized it to see if there had been any

5   further mention of it, and there is, right?

6        MS. ARENAS-BATTLES:  I can address that.

7        MR. SCARRITT:  Okay.  My co-counsel says

8   she'll address that in her time.  But in any event,

9   I want to wrap up, because this is -- I've probably

10  gone over my time.

11       So, in summary, we believe that we should have

12  a motion to dismiss with prejudice with respect to

13  the negligence and the writ of mandamus, and there

14  will be further discussion on the inverse

15  condemnation.  Thank you, Judge.

16       THE COURT:  Thank you.  Your turn?

17       MS. ARENAS-BATTLES:  Yes.

18       THE COURT:  Okay.

19       MR. SOUTHRON:  Your Honor, if -- if we may, I

20  think we'd prefer to do one motion at a time, not

21  go from one motion to the next before we hear from

22  the plaintiffs.

23       THE COURT:  Fair enough.  You want to respond?

24       MR. SOUTHRON:  Yes, Your Honor.

25       THE COURT:  Okay.

1     MR. SOUTHRON:  Good morning, Your Honor.  My

2  name is Joe Southron with the plaintiffs.  I

3  represent Harry and Janet Denlinger.  My co-counsel

4  would like to give a brief statement before I do my

5  arguments.

6     MR. SCARRITT:  Your Honor, we object.  We

7  didn't have a chance to have a brief statement or

8  an opening argument, so we'd like everyone to just

9  stick --

10     MR. SHEA:  We have no objections if he wants

11  to make one.

12     THE COURT:  I'll allow it.  Overruled.

13     MR. SHEA:  Your Honor, I represent the

14  Denlingers, and then a companion suit, Mr. Valdez,

15  south of here, and I want to make it real clear

16  from the very beginning that we're interested in

17  having that subdivision built and/or seeing some

18  nice, new, green, rolling hills down there.

19     I represent a lady and her brother that were

20  born and raised on the piece of property just north

21  of this, and she's very connected to this

22  community, although she --

23     MR. SCARRITT:  Objection, Your Honor.  This is

24  all outside the record, and it's inappropriate for

25  your consideration.

1      MR. SHEA:  It's an opening statement.

2      MR. SCARRITT:  But this is not a trial.

3      THE COURT:  Wait a minute.  You didn't

4   identify yourself for the record first, so put your

5   name on the record.

6      MR. SHEA:  My name is Michael Shea, and I

7   represent Harry and Janet Denlinger.

8      THE COURT:  Okay.

9      MR. SHEA:  And we're --

10      THE COURT:  Wait a minute.  I've got to rule

11   on the objection.  I'm going to allow it as part of

12   an opening statement, but keep argument out of it,

13   and overruled for now.

14      MS. ARENAS-BATTLES:  Judge, I'm going to

15   object also, just because this is also outside the

16   four corners of their complaint.

17      MR. SHEA:  I'll keep it inside the four

18   corners.

19      THE COURT:  Okay.  Then that part will be

20   sustained.

21      MS. ARENAS-BATTLES:  Thank you.

22      MR. SHEA:  We have simply asked that they

23   comply with what they allowed to be permitted in

24   2006:  Build the subdivision.  Just build it.  And

25   if you're not going to do that, tell us what you're

1    going to do.  If you need our help, we'll be more

2    than happy to help.

3         We're not interested in the money.  If we win,

4    we're going to put it in a trust and give it to

5    somebody.  My client is very involved in this

6    community.  She's been on the Saint Leo Board for

7    ten years.  She's donated to many things in this

8    city, in spite of the fact that she lives in New

9    Jersey.

10        So I want to make it clear:  We're not in this

11   case to make any money.  We want to see some nice,

12   rolling hills out there and/or a subdivision.

13        MR. SCARRITT:  Your Honor, we'd move to strike

14   everything he just said from the record.  It's

15   outside the four corners of their complaint, and

16   it's outside the record.

17        THE COURT:  I'll overrule.  Thank you.

18        All right.  Mr. Southron.

19        MR. SOUTHRON:  Your Honor, I want to thank

20   Mr. Scarritt for being up front about how close

21   some of the issues are in this case.  It's our

22   position that there are a lot of close issues in

23   this case.  We think that these kinds of issues are

24   not properly ruled on in a motion to dismiss

25   hearing.

```
1          And I also want to thank co-counsel for
2     pointing out that the inquiry, you know, the
3     question before the Court is the four corners of
4     the complaint, and it's not a hard question.  Did
5     the plaintiffs comply with the technical rules of
6     civil procedure in bringing their complaint?
7          The theory of this case, for us, is simple,
8     which is that we want you guys to do your job,
9     build the subdivision, and if not, pay damages.  I
10    think, from what I'm hearing, the theory of their
11    case is simple as well, is "It's not our job."  All
12    right?
13         That's where we disagree, and I think there
14    are many questions of law that need to be answered
15    as to whether duties are ministerial or whether
16    something is operational or discretionary.  What we
17    think would satisfy a well-pleaded complaint is
18    that we say it does, within the four corners of the
19    complaint, and we put forward the facts that the
20    defendants can see where we're coming from.
21         So I'm just going to go through the complaint
22    and go through the elements and just show where
23    we've pleaded the elements, but then I also will
24    get into some of the legal issues and where we
25    think that this lawsuit has ample legal support, at
```

1    the very least, to exceed the pleading stage.

2        So first, I'd like to just go over Count 5 in

3    the second amended complaint.  This is the writ of

4    mandamus against Dade City.  And forgive me, Your

5    Honor, I also want to point out that we have filed

6    a motion for leave to amend, so I may, at times,

7    point out what we pleaded in the second complaint

8    and what we've pleaded in the third amended

9    complaint.  And the reason why is because even if

10   the Court does deny the motions to dismiss, we will

11   still seek to file the third amended complaint, so

12   that will end up in front of the Court at some

13   point.

14       All right.  So Count 5 under writ of mandamus,

15   and I want to use Dade City's elements here to just

16   show.  I'm just going to go element by element to

17   point out where we've -- we've pled the elements.

18       All right.  So paragraph 4, first element is

19   that the petitioner has a clear and certain legal

20   right.  Well, the petitioner here, the Denlingers,

21   certainly have a legal right for them to not have

22   their property taken.  They have a water right.

23   They have a right to lateral support, and they have

24   a right to the value of their land.

25       Now, we've incorporated all our factual

1     allegations here.  We think it's sufficient to say

2     that they've been damaged, that they have a certain

3     clear, legal right.  Now, we've not pleaded --

4     well, we have a legal right, but the rules of civil

5     procedure require a factual pleading, the ultimate

6     facts, all right?  Now, this is a civil court.  If

7     a plaintiff has damages, we think that ought to be

8     fairly straightforward, all right?

9          Number 2, to the performance of a particular

10    duty.  The City doesn't just issue permits.

11    They're not a permit agency.  They are a city.  I

12    think what the defendants are trying to narrow this

13    case down to is that they're a permit agency.  They

14    issue a permit, but really the story is much more

15    comprehensive than that.

16         What the City is required to do, under

17    statute, is they're required to have what's called

18    a comprehensive plan.  And if I may, Your Honor, I

19    just want to bring these statutes up, so I can

20    reference the statutes as well.

21         MR. SCARRITT:  Do you have a copy?

22         MR. SOUTHRON:  I have one for you.

23         MR. SCARRITT:  Thank you.

24         MR. SOUTHRON:  There's nothing in here but

25    statutes.  I just compiled this in the past few

1       days for simplicity.

2               THE COURT:  Thank you.

3               MR. SOUTHRON:  The first statute I want to

4       bring up is Florida Statute 163.3202.  This is the

5       Florida statute on land development regulations.

6       All right?  This -- this is something that cities

7       and counties and municipalities are required to

8       follow when managing their city or their

9       jurisdiction.  All right?

10              Sub 1 says within a year of a submission of a

11      comprehensive plan, each county or municipality

12      shall adopt or amend land development regulations

13      that are consistent with and implement their

14      comprehensive plan.  All right?

15              So right from the threshold, the City is

16      required to have a comprehensive plan for as --

17      what's going to be developed where, what types of

18      zoning they're going to do, et cetera, et cetera,

19      and they're required to pass land development

20      regulations to do the same.

21              Now, we've pointed out in our complaint that

22      the City needed to pass new land development

23      regulations for this development.  You know, Dade

24      City does not have a lot of 300-house subdivisions,

25      so this was mostly a new thing.  And they did that.

1    They passed those.  All right?

2        Sub 2 says (as read), "Local land development

3    regulations shall contain specific and detailed

4    provisions to implement the adopted comprehensive

5    plan."

6        And Sub(a) -- 2(a) says, "Regulate the

7    subdivision of land."  Sub 2(b) says, "Regulate the

8    use of land and water," and further in the

9    paragraph, it says, "Ensure the compatibility at

10   adjacent uses."

11       Sub(d), "Regulate areas subject to seasonal

12   and periodic flooding."

13       Your Honor, these are all the things that

14   we're saying they did not do.  To the extent that

15   they passed regulations that would accomplish these

16   mandated goals by the legislature, they didn't

17   enforce them.  All right?

18       So this is where we're coming from when we say

19   that the plaintiffs are entitled to a performance

20   of a particular duty.  We're not saying issue a

21   better permit or withdraw merely a permit.  We're

22   saying you need to enforce the law.  All right?

23       Number 3, "By a government representative," I

24   think that one is clear.

25       And 4, "Whose performance of that duty is

1    ministerial and not discretionary."  This is one of

2    those issues that we -- we will have to be up front

3    with the Court and say we think this is a close

4    call; however, we do have a set of cases that we

5    think are in our favor.  If you'll give me a

6    minute, I just need to move in my large binder

7    here.

8        I want to refer to paragraph 3 of our response

9    to Dade City's motion, where we discuss this case,

10   State Corbett v. Churchwell.  This was a case

11   about -- give me a second.  I want to make sure I

12   get the facts right.

13       So this is a case about a real estate agent

14   who wanted his license.  And I really like

15   Mr. Scarritt's analogy about the driver's license,

16   because this case is very similar.  This is a case

17   where the agent wanted a license, felt he deserved

18   it, and filed a writ of mandamus to have his real

19   estate license issued, and the Court ultimately

20   said no, that's a discretionary function.  However,

21   what the Court also said is that you are compelled

22   to have a hearing to determine whether he is

23   entitled to that license.

24       And so there are certain government functions

25   that, even though the end result may be

1    discretionary, that the performance of it

2    whatsoever is not.  It is mandatory.  And this

3    entire case, Your Honor, regarding the writ of

4    mandamus, the dispute between us and the defendants

5    is whether those government duties to regulate land

6    development and to implement your comprehensive

7    plan are discretionary or mandatory.

8         What the cases that we've cited say, as a

9    whole, going all the way back to 1850, is that --

10   and I'm going to cite from Tole v. State, "Where

11   discretion is vested in an executive officer by

12   law, and mandamus will lie to compel him to proceed

13   to the exercise of his discretion, but not

14   directing him as to the mode and manner of its

15   exercise or as to the decision he should make.

16   This is a matter for his own judgment."

17        What we're arguing is that the City has done

18   absolutely nothing at all.  Fourteen years ago,

19   Defendant Summit View said they were going to build

20   a subdivision.  And now, 14 years later, all

21   they've done was dug two quarries into the earth.

22   Now our complaint is saying:  We need Dade City to

23   do something.

24        Now, I want to go to the next element, which

25   is that there's no other method for relief.  There

1    is nobody, except for Dade City, that can force

2    Summit View to build a subdivision.  Now, if they

3    don't build it, we agree there's a damages remedy,

4    but what we're actually seeking, as my co-counsel

5    has said, is for the subdivision to be built.  We

6    are much more interested in the preservation of the

7    character of St. Joe Road and the land surrounding

8    it than we are interested in damages.

9         It's -- our writ of mandamus, Your Honor, is

10   asking the City to force Summit View to build the

11   Summit -- the subdivision that they said they

12   would.

13        So that's the elements.  We've pled these

14   elements, paragraph 121 of the second amended

15   complaint.  We asked them to have a hearing on

16   these permits.

17        Now I want to address an argument that Dade

18   City has made regarding these permits.  It's simply

19   not true that Dade City has nothing to do with the

20   SWFWMD permits.  In fact, the only reason Summit

21   View requires that permit is because Dade City's

22   land development regulations says they have to get

23   it.  Now, Dade City is not primarily responsible

24   for water.  They're not the water management

25   district, but they do require the developer to

1    obtain those permits.  So we think they do have

2    something to do with those permits.  All right?

3         So with respect to the writ of mandamus, we

4    feel like this complaint -- this claim is well

5    pleaded.  We do not think it's appropriate to

6    dismiss in a motion to dismiss.  We do agree there

7    are unresolved questions of law.  We feel the

8    proper procedure is that this claim be permitted to

9    go forward.

10        Following that, the plaintiffs will have to

11   file a motion for the issuance of a writ, and in

12   that motion -- it's almost equivalent to a motion

13   for summary judgment -- we think both parties can

14   fully brief the Court on whether what we're asking

15   is discretionary or mandatory.  If the Court agrees

16   to grant that motion, then an alternative writ can

17   be issued.

18        All right.  So I'm going to move on now to the

19   negligence claim.  The first thing I want to

20   address with regard to the negligence claim is the

21   letter, Your Honor.  And defendant is correct, we

22   messed this one up at the outset of this lawsuit.

23   I want to present to the Court a copy of the letter

24   that we sent on December 18th.

25        Now, there is some case law out there that

1    says constructive notice may satisfy.  We thought

2    it was easier to just get the letter together,

3    present the letter, and this is the letter.  So

4    this was mailed December 18th.  It was about six

5    months ago.  So this was a mistake we made;

6    however, we believe, at this point, it is moot.

7         All right.  So I'm going to move on now to the

8    negligence claim against the City in the elements.

9    I think, again, the real difference here between

10   the parties, the point of dispute, is:  Is the City

11   a permit agency or are they a city?  And do they

12   have actual duties to the parties?

13        A negligence claim is quite simple.  It's a

14   duty, breach, causation, damages.  What's in

15   disagreement here is really that duty.  Defendant

16   Dade City has cited a case, which he's discussed at

17   length, and I don't begrudge him at all for

18   thinking he's exactly on point, and I'm sure you're

19   not surprised that we don't think it is on point at

20   all.

21        All right.  That case -- let me get out the

22   case style, because I want to get into this case.

23   It's the case of Trianon Park Condo v. City of

24   Hialeah.  The first thing I want to talk about this

25   case is this case deals with the building codes.

1       We've not complained about building codes, because

2       there hasn't been any buildings.  What we're

3       primarily concerned with is the violation of the

4       land development regulations, violation of the

5       comprehensive plan.  Those violations were done on

6       behalf of Summit View, but Dade City has sat back

7       and allowed that to happen for 14 years while strip

8       mining operations have taken place.

9           So on the facts, I don't think these cases are

10      the same.  Building codes are not the same as

11      zoning.  Building codes are not the same as

12      permits.  These are all different tools in a city

13      planner's toolbox to help them carry out their

14      plan, but they're not all the same.

15          Even aside from the disagreements we have on

16      the facts of this case, I think the legal

17      proposition that this case stands for is not that

18      these are discretionary functions.  This case is

19      actually about sovereign immunity.  The question

20      before the Supreme Court in this case was:  Does

21      the Statute 768, the waiver of sovereign immunity,

22      does that create a new duty?  Does that create a

23      common law duty to carry out discretionary

24      government functions with some duty of care?  And

25      the Court said no.

1    So Your Honor, I want to refer to page 918 in

2    this case where the Court is laying out its

3    findings.  And at the very top of 918, the Court

4    says, "Third, there is not now, nor has there ever

5    been, any common law duty for either a private

6    person or a governmental entity to enforce the law

7    for the benefit of an individual or a specific

8    group of individuals.  In addition, there is no

9    common law duty to prevent the misconduct of third

10   persons."

11   The Court goes on to say, under paragraph 6 --

12   I'm skipping down to "Fifth."  It says, "Fifth,

13   certain discretionary government functions are

14   inherent in the act of governing and are immune

15   from suit.  It is 'the nature of the conduct,

16   rather than the status of the actor,' that

17   determines whether" or not it's a discretionary

18   thing.  I'll discuss that case in a minute.

19   But I want to find this other language.  So

20   going back to the prior page 917, the first finding

21   of the Court.  (As read) "For there to be

22   governmental tort liability, there must be an

23   underlying common law or statutory duty of care."

24   We're not alleging a common law duty of care.

25   We're alleging a statutory duty of care.  And that

1    can be found in this statute that we've cited,

2    which is 163.3202.  Dade City has a responsibility

3    to put together a comprehensive plan, and they have

4    a duty to carry out that plan.  It's a statutory

5    duty.  It's not a common law duty.  So we're not

6    arguing that there is a common law duty, and

7    therefore we don't think this case is on point.

8         The other Supreme Court case we want to

9    discuss is Common [sic] Carrier.  This was the

10   prior case to Trianon, and is the landmark case

11   interpreting what, exactly, did the State waive

12   when it waived its sovereign immunity.  And give me

13   a second.  I'll find the location.  Sorry.

14        It's Commercial Carrier.  So what -- what this

15   case was about, it's a personal injury case.

16   Somebody crashed and was injured by the failure of

17   lights, traffic lights.  And the municipality came

18   in and made the same argument that Dade City is

19   making today which is, "Not our fault.  This is a

20   discretionary action.  We can't be liable in

21   negligence.  The State did not waive sovereign

22   immunity for that."

23        And what the Court held was that you can,

24   because traffic lights is an operational

25   responsibility of the City.  It's not a

 1          discretionary function.

 2                 And so this is very much the same question

 3          that we have in the writ of mandamus.  Is this a

 4          discretionary function or is it not a discretionary

 5          function?  If it is not, then the City can't be

 6          held liable for negligence.  We think carrying out

 7          the law, enforcing the law, especially laws that

 8          are passed for the purpose of protecting the public

 9          health and welfare, are operational, mandatory

10          responsibilities.

11                 Now, the outcome of the implementation of

12          those laws may involve discretion, but the City

13          cannot just sit on its hands and do absolutely

14          nothing at all while strip mining operation takes

15          place.

16                 I want to address the three-year notice

17          requirement.  Our argument is that the statute of

18          limitations for all of the causes of action in this

19          case began accruing in 2018.  And that happened

20          because the City sent a letter to some of you

21          saying, "You're done.  Your permits are revoked.

22          Your zoning is now reverting back to agricultural

23          zoning, which does not allow dirt mining

24          whatsoever."

25                 And at that point, it became clear to our

1    client, and all the other neighbors, that there was

2    no subdivision ever going to be built.  We think it

3    is well understood that for any statute of

4    limitations to begin tolling, that the person

5    injured needs to know that they've been injured.

6         Sometimes the most deceptive thing is an

7    obvious fact.  And we think in this case, that is

8    exactly what happened with Summit View.  He said,

9    "I'm building a subdivision," even though it should

10    have been obvious a long time ago he wasn't, but

11    everybody, including our clients, wanted to give

12    him the benefit of the doubt that he would do that.

13    It's much better if he does it late than never.

14         Well, it's been 14 years, Your Honor.  In 2018

15    when he lost that zoning, it was over.  All right?

16    At that point, it was clear that he can't build a

17    subdivision.

18         So with regards to the inverse condemnation

19    claim, I'm not saying we're pleading this in the

20    alternative, but to some extent, if a subdivision

21    is built -- by some grace of God, at this point.

22    We don't think it's possible, but if it were to be

23    built the way that some of you said they would 14

24    years ago according to the same plans -- there may

25    not be an inverse condemnation.  We'd have to wait

1    and see what was actually built.

2         But the nature of the inverse condemnation is

3    that they didn't build it.  Water has been taken,

4    adjacent lateral support has been taken, economic

5    value has been taken, and then a parallel case to

6    this, Bob Valdez's entire property was destroyed by

7    flooding and silt.  That needs to --

8         MS. ARENAS-BATTLES:  Objection, Your Honor.

9    I'm going to object to any discussion of Valdez.

10   We're here on the Denlinger case today.

11        MR. SOUTHRON:  Well, Your Honor, what happened

12   in Valdez --

13        MR. SCARRITT:  I object to that.  This is

14   another whole case that hasn't even been ratified

15   by the Court, so we don't even know if we have a

16   case.

17        THE COURT:  All right.  I'll sustain.  Move

18   on.

19        MR. SOUTHRON:  All right.  So I want to talk

20   about the Hillsborough County Gutierrez case.  We

21   don't think it's a funny case at all, even though

22   it did happen down in Tampa.  We think that it is

23   the controlling case for the inverse condemnation

24   claim, and could not be more factually similar to

25   what actually happened here -- what is happening.

1          So what happened in this case is there was

2     some development.  As a result of the development,

3     the Gutierrez land was destroyed.  It was destroyed

4     by the failure to follow the drainage plan, and the

5     Court held several very interesting findings that

6     we think are controlling here.

7          The first, which is on page 1, in the middle

8     of the paragraph starting at 1970, it says, "During

9     the construction of the various phases of the

10    subdivision, the County had the responsibility to

11    the general public to assure that the developer's

12    drainage plan would work effectively for the

13    disposal of all surface drainage water."

14         Now, why is his drainage plan important?

15    That's important because pursuant to the City's

16    comprehensive plan, they must pass land reg --

17    development regulations, and then all of the

18    building plans that the developer actually submits

19    need to also follow those land development

20    regulations.

21         And this Court found that was Hillsborough

22    County's job to make sure that the developer

23    followed those drainage plans, and they did not.

24         If I go to page 2, paragraph 7, the Court held

25    two more findings.  All right?  It says, (as read)

1       "The Court is convinced, after examining all of the

2       evidence and a personal view of the physical area,

3       the drainage ditches proposed on the east and west

4       sides of 58th Street to Plaintiffs' property and

5       designed in the master drainage plan for the Palm

6       River Subdivision could have been -- could have

7       prevented the flooding of Plaintiffs' property if

8       they had been constructed in accordance with the

9       drainage system proposed for the development" --

10       and here's the key part -- for -- "which the

11       enforcement of such construction was the

12       responsibility of Defendant, Hillsborough County."

13          Your Honor, that's exactly what happened here.

14       In 2005, Summit View put together these plans,

15       said, "Here's what I'm going to build."  Fourteen

16       years later, he's dug a quarry.  He's completely

17       diverted all the natural rainwater from the

18       Denlinger property all the way down to the

19       neighboring property, Valdez.  That was not done

20       according to plan --

21          MR. QUAM:  Your Honor, again, I object.  The

22       Valdez case is not in the complaint, and it's a

23       different action than this one.

24          THE COURT:  Thank you.  Sustained.  And for

25       the record, who was that objection from?

1    MR. QUAM:  Darrin Quam, attorney for Summit
2    View.
3    MR. SOUTHRON:  Your Honor, I just want to
4    state that the existence of the Valdez property is
5    not established by the complaint.  It just happens
6    to be there.
7    THE COURT:  All right.  I'll sustain.  I don't
8    want to talk about that.
9    MR. SOUTHRON:  But what this Court said is
10   enforcement of that construction is the
11   responsibility of Hillsborough County, and we're
12   arguing the same exact thing here.
13   The Court went further.  "Additionally, the
14   Defendant, Hillsborough County, through its review
15   procedures of the planned drainage system for Palm
16   River Subdivision, should have determined that any
17   natural flow of surface drainage water from the
18   northeast to the southwest would have been impeded
19   by the addition of 'fill' material" -- so on and so
20   forth -- "abutting the southwest corner of
21   Plaintiffs' property.  Such review had required
22   additions to the drainage system which would have
23   prevented the 'ponding' which now occurs on the
24   southwest portion."  So in addition to enforcement,
25   Hillsborough County had a duty to review what the

1    developer was doing.

2        The same thing happened here.  Fourteen years

3    ago, the developer submitted these beautiful plans

4    to build this amazing subdivision on top of Happy

5    Hill, and then said, "I'm going to remove

6    2.4 million cubic yards of dirt."

7        Now, to a layperson, that may just be an

8    extraneous engineering detail, and in reality, that

9    should have put any reasonably prudent city

10   engineer on notice that this was not a subdivision.

11   The average amount of dirt that is removed for a

12   subdivision of this scale is about 10,000 cubic

13   yards.  2.4 million is an incredibly large amount

14   that should have come up in their review

15   procedures.  That represents over

16   100,000 truckloads of dirt.

17       So in conclusion, we feel that we've not only

18   pled the elements as the Rules of Civil Procedure

19   require, we feel that there's ample legal support

20   to move this case forward.

21       We would request that the defendant's motion

22   be denied.  We request that defendants be asked to

23   answer the complaint within 30 days of that ruling.

24       And also, we would request the case management

25   conference, so we can discuss what to do with our

```
 1        motion for leave to amend for the third amended
 2        complaint.  Thank you.
 3             THE COURT:  Thank you.
 4             MR. SCARRITT:  Your Honor, brief rebuttal?
 5             THE COURT:  Yes.
 6             MR. SCARRITT:  Like we discussed at the last
 7        hearing in May, Judge, we've been at this for a
 8        year.  We still don't have a -- what we contend is
 9        a viable complaint.  And today, for the first time,
10        I'm hearing that they have an entirely new theory,
11        that's not pled, that is Florida Statute Section
12        163.3202.
13             I looked through the complaint very carefully.
14        It doesn't appear.  You would have thought that we
15        would have seen this in a year, but as I understand
16        it -- and I'm winging it somewhat, Judge, so
17        forgive me -- but their theory is that they -- the
18        legal duty that they're talking about that they
19        contend the City has, is created by the land
20        development regulations in Florida Statute
21        163.3202, which lay out general rules for the
22        development and creation of land development
23        regulations.
24             There is nothing in here that creates a cause
25        of action.  There's nothing in here that provides
```

1       them with the right to ask you to command the City

2       to do anything.  So this is really just more of the

3       same, Your Honor.  We, again, have been trying to

4       pin them down as to what their theories are.  We're

5       getting new theories a year later and would ask

6       you, Judge, to put an end to it by simply looking

7       at 163.3202, and look at the statute that they

8       cited that doesn't apply to us.  They just

9       applied -- they just throw these numbers out that

10      don't have anything to do with this.

11         I heard Mr. Southron say that, "We need Dade

12      City to do something."  To do something.  Well, the

13      something that they're asking for is a hearing.

14      What type of hearing?  Who -- how are we supposed

15      to give notice?  What is the basis for the hearing?

16      What is the goal of the hearing?  Who decides the

17      hearing?  Is it city manager?  Is it the mayor?  I

18      mean, it's just a general request for some sort of

19      hearing because we're not happy.  That's what it

20      is, Your Honor.

21        And if the City wanted to do it, let's say

22      that they're sympathetic and one of the few things

23      I agree with Mr. Shea is that this is an unusual

24      case because the parties all say that they want the

25      development.  Usually when you have a land use

1    case, somebody's -- doesn't want the development

2    and that's why you have a lawsuit.

3        Here, supposedly, everybody wants the

4    development.  The city wants the development.  The

5    Denlingers want the development.  Dr. Weiland wants

6    the development, but, you know, it's -- it is an

7    impossibility for the City to hold some sort of

8    hearing to try to -- I don't even know what it is

9    that they want us to do.

10       They say that -- they admit that they've got

11   money damages available to them in a court of law.

12   Well, that's the end of -- of the mandamus, because

13   that's one of the -- that's one of the six

14   criteria.  They say they're interested more in

15   aesthetics than they are in money.  They're going

16   to put things in trust, which is all well and good.

17   It sounds wonderful, but that's not what the law

18   allows.

19       You don't get to decide whether you are

20   allowed to pursue what you consider to be an

21   aesthetic development as opposed to get money

22   damages because it's damaged you.

23       I commend them very much for admitting their

24   error in the December 18, 2018, letter.  Judge,

25   it's a showstopper.  All you've got to do is read

1    the cases, read the law.  They can't go forward on

2    this letter.  It's outside the statute of

3    limitations.  It's inadequate.  It doesn't

4    provide -- the City never -- was robbed of its

5    chance to have a six-month investigation period.

6    The fact that they say it's moot is not true.  It's

7    very, very, very relevant, because the statute is

8    set up very specifically.

9         Trianon, they say, doesn't apply.  It's

10   probably the most important case in land use in the

11   state of Florida.  It's quoted in other states in

12   their law review.  And they say it doesn't apply

13   because they're dealing with common law, and we

14   allege a statutory duty.

15        Again, Judge, where is the statutory duty?

16   It's not in the complaint, and they tacitly admit

17   that.  So they've come up with a new statute.  And

18   we'd ask you to look at that.  It's just two pages.

19   It has nothing in it that provides them with any

20   basis for going forward in this lawsuit.

21        They say that the statute of limitations

22   doesn't apply.  The defense doesn't apply because

23   everything began accruing in 2018.  Now, Judge,

24   this is a classic case of you're damned if you do

25   or you're damned if you don't.

1       What the City did last year, when we first got

2    involved in this case, was they engaged with the

3    Weiland Group, and they had a battle with them over

4    the very things that they are talking about.  An

5    injunctive suit was filed by the City.  A stop work

6    order was entered.  A fine, a citation was put

7    against them, all over the exact same things that

8    they're complaining about, right?

9       MR. SOUTHRON:  Objection, Your Honor.  This is

10   outside of the four corners.

11      MR. SCARRITT:  Oh, please, Judge.  I'd ask for

12   a little leniency.

13      THE COURT:  You opened the door.  Overruled.

14      MR. SCARRITT:  And so they filed a Bert

15   Harris, too, lawsuit back against the City.  It was

16   litigation Armageddon, okay?  And then we have this

17   case going and the Valdez case.  It was about seven

18   pieces of litigation all going at the same time.

19      And the City and the Weiland Group were able

20   to resolve it, and they have a specific settlement

21   agreement, that we'll provide to you if we ever

22   have to, that basically was designed to take care

23   of the very issues that they're talking about.

24      Now, that may be, you know, at issue for, you

25   know, a factual issue and -- but I'm just telling

1    you that it's a little galling to sit here and

2    listen to the fact that we want the City to do

3    something.  And this is what they did.  The

4    settlement agreement is what came out of it.  And

5    the parties are trying to work towards what

6    everybody claims they want, which is to get a

7    subdivision.

8        I will -- I will leave the issue about the

9    Gutierrez case to my very learned SWFWMD counsel

10   here.  And thank you, Your Honor.

11       MR. SOUTHRON:  Your Honor, if I may, I want to

12   address this settlement agreement, since co-counsel

13   has now put it at issue -- I'm sorry -- opposing

14   counsel.

15       This is a motion to dismiss hearing.  We did

16   not bring up this settlement agreement; however,

17   the plaintiffs have seen the settlement agreement.

18   It's been recorded.

19       There are several problems with it.  The first

20   is that agreement reissued the zoning which had

21   already been revoked without notice or a public

22   hearing.  So that's the first problem.

23       THE COURT:  I'm not going to get into the

24   issues of the settlement agreement.  We've got

25   plenty to talk about without that.

1        MR. SOUTHRON:  Okay.

2        THE COURT:  So that will be for another day.

3        MR. SOUTHRON:  We believe the settlement

4    agreement is insufficient.

5        THE COURT:  Okay.  All right.  I did have a

6    couple of questions.  Several have been answered.

7    One -- and these are primarily for my own almost

8    curiosity, if we may, so I can get a real picture

9    of the whole process here, not necessarily towards

10   any of the specific allegations in any of the

11   pleadings.

12       I've reviewed a voluminous amount of

13   documents, case law, pleadings, et cetera, and it

14   seems to me I originally saw that there was an

15   original amount of dirt to be taken somewhere in

16   the 7,000 range -- 7,000 cubic yards.  Was that

17   nothing?  No.  All right.

18       Because obviously, now, it's -- the permit was

19   issued for 2 million something, 22 million,

20   200,000, something along those lines?  Okay.

21       And I did have a question about the letter.

22   Was there ever a letter sent?  Obviously it was.

23   And -- oh, okay.  Was the -- was the comprehensive

24   plan amended in order to permit this subdivision?

25       MR. SCARRITT:  Your Honor, I don't know, but I

1 can find out.

2   THE COURT:  Someone's saying "yes."

3   MR. SCARRITT:  I wasn't the attorney at the

4 time, but I can find out.

5   THE COURT:  Yes, sir?

6   MR. WEILAND:  Douglas Weiland representing

7 Summit View.  The comp plan was amended to allow

8 the subdivision.  And to clarify, we -- what we did

9 is we did put in a permit, initially, for

10 2.2 million cubic yards, which we've just about

11 finished.  We dug ten ponds.  We've maintained a

12 rolling hill nature of the subdivision.  We

13 followed all our permits.  We are ready to have a

14 subdivision built.

15   MR. SOUTHRON:  Objection, Your Honor.

16   MR. WEILAND:  We have a Lennar contract which

17 is being held up by this litigation, so despite

18 what's being told about the story, that's not the

19 case.

20   THE COURT:  Okay.  Thank you.  All right.  So

21 the --

22   MR. SOUTHRON:  Your Honor, I'd like to move to

23 strike the defendant's comments.

24   THE COURT:  All right.  Overruled.

25   Comprehensive plan was amended.

1          Okay.  And Mr. Scarritt, you argued against --
2     which counts were directed towards your client?
3          MR. SCARRITT:  It's the writ of mandamus and
4     negligence and inverse condemnation.  I'll give you
5     this.
6          THE COURT:  And which numbers are those?
7          MR. SCARRITT:  The writ of mandamus is
8     Count 5, Your Honor.  It's against -- oh, that's
9     yours.
10          MS. ARENAS-BATTLES:  Yeah.
11          MR. SCARRITT:  I'm sorry.  That's theirs.
12          Six, Your Honor.  It's Dade City and
13     Mr. Sherman.
14          THE COURT:  Is the mandamus?
15          MR. SCARRITT:  The writ of mandamus.  And then
16     count -- Count 8 -- hold on -- Count 7 is inverse
17     condemnation against SWFWMD and Dade City.  And
18     Count 8 is negligence against SWFWMD and Dade City.
19          THE COURT:  All right.  Now, who wants to go
20     next?
21          MS. ARENAS-BATTLES:  That would be me.
22          THE COURT:  All right.
23          MS. ARENAS-BATTLES:  Good morning, Your Honor.
24     My name is Vivian Arenas-Battles.  I'm an attorney
25     with the Southwest Florida Water Management

1  District, and I'm going to try and go through this

2  in some -- somewhat of an orderly fashion.  I'll

3  try and go through it as quickly as possible, since

4  we've covered some of the areas.  But the counts

5  that remain --

6      MR. SHEA:  Your Honor, could we take a break?

7  I see that Mr. Scarritt --

8      THE COURT:  Sure.  And that's appropriate.

9  We've been going at it for a little while.  Go

10  ahead.  We'll take a ten-minute recess.

11      MS. ARENAS-BATTLES:  Okay.

12      (A recess was taken from 10:57 a.m. to

13  11:09 a.m.)

14      THE COURT:  All right then.  Ms. Battles, are

15  you ready to begin?

16      MS. ARENAS-BATTLES:  Yes, Your Honor.

17      THE COURT:  Go ahead.

18      MS. ARENAS-BATTLES:  Your Honor, the counts

19  that apply to the district, specifically, are

20  Count 5, Count 7 and Count 8.  Count 5 is the writ

21  of mandamus, wherein they're requesting that the

22  District and the district's executive director,

23  Brian Armstrong, review, via public hearing, what's

24  known as an environmental resource permit pursuant

25  to 373.429 Florida Statutes; Count 7, which is an

1    inverse condemnation claim against the district;

2    and Count 8, which is a negligence claim against

3    the district.

4        Preliminarily, I would ask that the Court

5    distinguish, again, between the parties that are

6    the parties to this suit.  You have the City.  You

7    have the Water Management District that, for the

8    purposes for this suit, is an agency pursuant to

9    Florida Statutes.  And then you have a private

10   entity as well.

11       And the reason that's important, Your Honor,

12   is, as the Court is aware, there are specific

13   statutes and rules that apply to cities that may

14   not apply to state agencies, that may not apply to

15   counties.  That's why each of us has our governing

16   statutes, our governing rules, and that's important

17   in this case, because to some degree, in the

18   complaint, we're all being lumped together.  And I

19   think that's for the purpose of trying to attribute

20   activities to some that may not be attributable to

21   others.  So throughout this, I think it's important

22   to continue to remember that.

23       But all counts relating to the District relate

24   to the issuance of the environmental resource

25   permit, which we are -- our acronym for it is the

1    ERP, and you'll hear that -- to Summit View in

2    2006.

3         And I think that the plaintiffs, in their

4    complaint, have put in numerous allegations of

5    other activities that basically occurred post 2006

6    into 2018, but all of those factual allegations

7    pertain to activities by the City.

8         The only thing the District did was issue a

9    permit in 2006.  We granted extensions to that

10    permit under emergency orders, and the expiration

11    date of that permit, I believe now, is 2019.  An

12    expiration date is not an issuance date, and that's

13    important, as I'm going to explain in my arguments.

14         So what we're asking is that those counts

15    against the District be dismissed with prejudice,

16    and I'm going to take them individually.  I'm going

17    to start, though, with our negligence claim.  And

18    the reason for that -- I'm going to ask if I may

19    approach.  We inadvertently left out of the packet

20    that was sent to you of Chapter 373.443 Florida

21    Statutes.  I did provide that to all counsel in the

22    last three days, as soon as we realized that was

23    missing from our packet.

24         But under 373.443 Florida Statutes, which is

25    specifically applicable to the District -- we are

1          governed by Chapter 373 -- the legislature has

2          included a provision under 443 that says, (as read)

3          "No action shall be brought against the state or

4          the district, for the recovery of damages caused by

5          the partial or total failure of any stormwater

6          management system, dam, impoundment, reservoir,

7          appurtenant work, or works upon the ground that the

8          state or district is liable by virtue of any of the

9          following."  And specifically under Subsection (1),

10         it says, "Approval of the permit for construction

11         or alteration."

12             That is what the plaintiffs have alleged here,

13         that we are liable in negligence for what appears

14         to be, from their pleading, the failure of a

15         stormwater management system.  Legislature has

16         specifically determined that we are immune from

17         liability for that type of activity.

18             Secondly, as an alternative, we're also immune

19         because it's a discretionary function of

20         government, and those types of activities are

21         immune under the -- from suit under the doctrine of

22         sovereign immunity.

23             And we are, again, a regulatory agency created

24         and existing under 373 for purposes of 768.28 under

25         the line of cases, and I'm not going to go back

1   through them, Commercial Carrier, Trianon Park,

2   Thompson v. Department of Highway Safety.

3        In both the Trianon case and its predecessor,

4   the Commercial Carrier case, the Supreme Court has

5   clearly stated that the discretionary functions of

6   government are immune from suit.  They have defined

7   those functions in four categories.  Category 1 is

8   that the legislative permitting, licensing and

9   executive office or functions are immune from suit.

10  That was in the Trianon case in 1985.

11       The Court held that there was no tort

12  liability for the action of government officials in

13  implementing activities in Categories 1, again, the

14  permitting functions, and Category 2, which is the

15  enforcement of laws and the protection of the

16  public safety.

17       In the Thompson v. Department of Highway

18  Safety case, which I have provided in our materials

19  at Tab 20, the Fifth DCA in 1997 went on to, again,

20  follow that, the Trianon line, and said that the

21  licensing function undertaken to enforce the laws

22  and protect the public safety was immune from suit.

23  In that case, there was -- a negligence claim was

24  filed requesting the revocation of a license, very

25  similar to this case.

1        In addition, more recently in 2018, under the

2   Florida Fish and Wildlife Conservation Commission

3   v. Daws case, this was an interesting case, and

4   it's a recent case.  Basically Fish & Wildlife

5   issued a hunting license on a piece of property.

6   The -- when they issued the hunting license, the

7   hunters trespassed onto an adjoining property.  The

8   adjoining property filed suit against Fish &

9   Wildlife and asserted the negligence claim.

10       The Court there said that the Fish & Wildlife

11  actions to authorize hunting on public lands are

12  purely discretionary functions of FWC, the Fish &

13  Wildlife, and relied on Trianon Park to hold that,

14  (as read) "The regulation of deer hunting involves

15  actions inherent in the act of governing, and that

16  those actions constitute discretionary acts and the

17  doctrine of sovereign immunity bars the claims."

18  That was the Fish and Wildlife case at 916 and 917.

19       So we are immune from suit pursuant to

20  statute.  We're also immune from suit pursuant to

21  the case law of sovereign immunity.  In addition,

22  they did fail to meet pre-suit requirements, and I

23  know they've now shown the -- if I can see that

24  latest letter.

25       Attached to their complaint was the letter of

1    December 14, 2018.  They did not attach the

2    December 18, 2018.  But that said one of the

3    pre-suit requirements is not only must you follow

4    notice of claim with the agency, but you must

5    follow notice of claim with the Department of

6    Financial Services.

7         None of these letters show that there's been a

8    notice of claim filed with Department of Financial

9    Services.  Under the Menendez v. North Broward

10   Hospital District case, which is in my Tab 11 at

11   91, it says, "Absent an allegation of departmental

12   notice, the complaint fails to state a cause of

13   action."  They did not allege that they filed with

14   the Department of Financial Services.

15        So they've still failed to meet pre-suit

16   requirements, even if they now consider the late

17   filing or the -- I guess the preliminary filing of

18   the action prior to the pre-suit notice to be moot,

19   they still have not met pre-suit requirements.

20        And under 768.28(6)(d), you are required to

21   wait the six months from the notice of the claim to

22   the suit.  Also you're required to file your suit

23   within the three years.  We, again, would allege

24   that under -- by their own complaint, the action

25   attributable to the District was in 2006.  They're

1    beyond the three years.

2         So for these reasons, the negligence claim

3    against the District should be dismissed with

4    prejudice.

5         The next one I'm going to take is the -- I'm

6    going to address the failure to state the cause of

7    action for the writ of mandamus, and there's been

8    considerable discussion on that.  What the

9    plaintiff is seeking, in their complaint, is the

10    review of the permit they now claim via a public

11    hearing by the District and Mr. Armstrong, our

12    executive director.  That's in paragraph 121 of

13    their complaint.

14         But, Your Honor, what they're also seeking is

15    the revocation of that permit, which is stated in

16    paragraph 130 of their claim when they say they

17    want review and revocation.

18         Revocation of permits is addressed in 373.429

19    of the Florida statutes.  That's the one that

20    they're asking for the revocation under.

21         Again, for a writ of mandamus, the plaintiff

22    must show clear legal right to the performance of

23    ministerial duty by the agency under the Miami-Dade

24    County case.  That's 730.

25         The ministerial duty has to be one prescribed

1    by law.  "If the discharge of the duty requires the

2    exercise of judgment or discretion, the act is not

3    ministerial and mandamus will not lie," under the

4    City of Coral Gables v. The State and Worley at

5    300.

6         Mandamus cannot be used to establish the

7    existence of the right itself, under the Florida

8    League of Cities v. Jim Smith case at 401, which is

9    all in our materials that we provided the Court.

10        So it's not appropriate.  This remedy is not

11   appropriate where entitlement to the right is in

12   dispute, and it needs to determined.  That's what

13   they're asking us to do here.  They're asking us to

14   order the governing board at the district to

15   convene a public hearing and to revoke this permit.

16   That's in their complaint.

17        That is not a discretionary -- a ministerial

18   function of government.  That is requiring us to

19   determine that they should have a permit revoked,

20   bring a hearing pursuant to 120, and then have our

21   governing board determine that revocation is an

22   appropriate remedy.  That is not what a writ of

23   mandamus is used for and does not apply in this

24   case.

25        So the writ of mandamus, and, further, the

1          executive director, under that statute, has no

2          authority to review and revoke the permit, so

3          Mr. Armstrong should be dismissed from the suit.

4          And the governing -- and the writ of mandamus

5          should be denied -- should be dismissed as to the

6          district's governing board as well.

7                As to the inverse, and I think all counsel

8          here agree that's probably one of our most

9          difficult counts to deal with, but that's Count 7.

10         Pursuant to -- or in reviewing their complaint, the

11         statute of limitations has run in this matter.

12               This ERP, environmental resource permit, again

13         issued in 2006 -- that's paragraph 40 of their

14         complaint -- under 373.617(2) -- again, a statutory

15         provision that we are governed by at the

16         district -- the legislature has determined that a

17         person that is affected by a final agency action --

18         issuance of a permit is a final agency action --

19         with respect to a permit, must seek review of the

20         permit issuance in circuit court within 90 days of

21         issuance of that permit.  They are well past those

22         90 days from the 2006 issuance of the permit.

23               A similar claim, and I -- yes, Your Honor.

24               THE COURT:  Let me ask you a question on that,

25         because I know it's coming.  Even if it doesn't, I

1    have a question about it.  What about the argument

2    that it's a continuously accruing cause?

3         MS. ARENAS-BATTLES:  Your Honor, the actions

4    attributable to the district are the issuance of

5    the permit.  The issuance of a permit is not a

6    continuing cause of action.

7         THE COURT:  What about the extensions?

8         MS. ARENAS-BATTLES:  Your Honor, they did not

9    indicate when the last extension was in their

10   complaint.  What they have strategically done is to

11   give you only an expiration date.

12        I can tell you when the extension was, the

13   last extension.  It put them outside of it, but

14   again, I'm not sure that the Court can consider

15   that, since it's not within the four corners.  But

16   the extent -- they purposely have not attached the

17   permit -- the permits in this case, and there's a

18   reason for that, because the last modification, if

19   you will, of the permits that were issued under

20   emergency orders from the governor during storm

21   seasons, and it was, I believe, 2014 was the last

22   one.  So there again, well past the time frame to

23   file this action.

24        But that is -- we did not put any of that,

25   because, again, it's outside --

1          THE COURT:  Understood.

2          MS. ARENAS-BATTLES:  But we are relying on the

3     statutory provision says they had 90 days.  They

4     had administrative remedies they could have pursued

5     under 120.  And what's important to that, Your

6     Honor, is that in their complaint, they keep

7     referring to they failed to build the subdivision.

8          What the District's permit actually permitted

9     was a mining operation with a future subdivision.

10    There's been no violation of that permit from the

11    District's perspective.  That's in their complaint.

12    I believe it's at paragraph 40, if I'm not

13    mistaken.  Hang on a minute and I'll tell you

14    exactly where that is in the complaint.

15         Paragraph 41 of their complaint, "The system

16    was to serve a mining operation with a future

17    residential subdivision."  That's in their

18    complaint.  That was the action.  Nothing has

19    changed.

20         So whatever activities they're claiming have

21    continued to occur, and I think they're making an

22    as-applied takings claim here.  It's -- as to the

23    district, it was as applied in 2006.  Nothing

24    changed from that point forward.

25         But again, this -- that Section 373.617 was

1    recently argued by the District in a case in

2    Hillsborough County.  Judge Barbas in the

3    Thirteenth Circuit, in that case, dismissed an

4    inverse claim against the District on similar

5    grounds.  And I did attach that.  In Tab 21 I've

6    attached his order, paragraph 4 of the order.  I

7    also attached it as an exhibit to our response as

8    Exhibit 8, the entire case, so that the Court would

9    have the facts as to what happened in that matter.

10        But a similar court in the 13th Circuit,

11   though we recognize that that's not controlling,

12   has basically dismissed that count -- a similar

13   count against the District on the grounds of

14   373.617.

15        Also they have failed to state a cause of

16   action as to inverse.  And, Your Honor, in a

17   typical -- you know, and inverse cases are kind of

18   unique, because where most of us are familiar with

19   the eminent domain actions, and those are the

20   formal exercise by government, taking property for

21   a public purpose.

22        An inverse is basically the taking without the

23   formal power of eminent domain, and there are many

24   types of inverses.  What we're dealing with here

25   basically, it appears from their complaint, is a

1     regulatory type of taking.  They allege a de facto

2     taking in paragraph 145 of their complaint.  And

3     they've got to show either a temporary or physical

4     invasion of their land for a public purpose, and

5     you have to have a regulation or a condition that

6     deprives the owner of the use of that property.

7           Again, here, the government action is the

8     issuance of the permit in 2006, but that permit was

9     issued to Summit View, not the Denlingers.  If you

10    go through most of the takings law, except for

11    apparently this one Gutierrez case, which I'll

12    address in a minute, the action for which the

13    taking is alleged is the subject of the property

14    that the regulation is imposed upon.

15          So, for an example, if you have a piece of

16    property, and you impose a new ordinance on it, and

17    that ordinance then somehow substantially

18    diminishes the value of that property, the inverse

19    claim is sometimes filed against the government for

20    that type of an action.

21          What they're alleging here is that the

22    regulatory action is basically the cause of problem

23    on a third party's property, and that is unique.

24    It has not been addressed, other than this one case

25    that they seem to have found, Gutierrez.  It has

1    not usually been addressed.

2         Like most of the attorneys in this room, I

3    think we've searched high and low for the case law

4    on this.  I will tell you there is a case that was

5    FINR v. Hardee County a few years ago that went to

6    the Supreme Court.  That was on a Bert Harris

7    action.

8         In that case, a third party, an adjoining

9    property owner was filing a Bert Harris action for

10   a setback that had been removed as part of a

11   rezoning on an adjoining property.  The Court there

12   did address that and said, You can't file -- you

13   can't be the adjoining party.  It has to be the

14   subject of the action on the actual property that

15   is affected.

16        But again, that is a Bert Harris case.  It's

17   not an inverse case.  I still think that's

18   relevant, but I think the courts have recognized

19   that, but we don't have it on inverses.

20        However, in the Florida Fish and Wildlife

21   case, again, the case I previously cited, the

22   activities alleged in that case were the agency

23   issued the hunting permit to the hunters, and the

24   adjoining property filed suit.  They, in that case,

25   as dicta, because those were negligence claims, but

1    there was an issue of a taking, the Court said that

2    adjoining owners had failed to allege either form

3    of a takings in their complaint.  So they have

4    somewhat addressed that, although they have not

5    directly addressed it on point.

6        Now, the plaintiffs have cited to Hillsborough

7    County v. Gutierrez for their position that the

8    inverse claim can be filed for failure to,

9    apparently, enforce a regulation.  Judge, I'm going

10    to point out that's a 1983 case.  It was against

11    the County and not a state agency.  And Fish -- the

12    Fish and Wildlife case seems to say somewhat

13    differently.

14        I did try and find as many facts as I could on

15    Hillsborough County's case out of somewhat

16    curiosity, but in Shepardizing that case, I did

17    pull up, and I've provided counsel with that a

18    little while ago because we just recently pulled

19    that, the case of Modern, Inc., v. Florida, and

20    it's a Middle District of Florida case.  If I can

21    approach.  During the break, I did provide that to

22    counsel.

23        In the model district -- Modern -- again for

24    the cite, it's the Modern, Inc., and First Omni

25    Service Corporation v. State of Florida, Department

1    of Transportation, and St. Johns River Water

2    Management District at 2008 -- actually, it's

3    reported -- I have a 2008 Westlaw 239-148.  It's a

4    2008 case.  They cited to Gutierrez in that case.

5         This is a case that apparently made its way

6    through the state court system, apparently may have

7    gone to the administrative proceedings, but in the

8    end, there was a claim filed in federal court --

9    the federal -- in the Middle District of Florida,

10   where they claimed an inverse condemnation against

11   St. Johns Water Management District and Fish &

12   Wildlife for flooding from operation of structures

13   and land owned by the Water Management District and

14   St. Johns.

15        And that's unique, because in this case we

16   don't own the adjoining properties.  In the Modern

17   case, apparently St. Johns and Fish & Wildlife

18   owned conservation lands adjoining this property.

19        But in the Modern case, Modern, the adjoining

20   property owner, moved for partial summary judgment

21   on the liability portion of the inverse claim.

22   There's two portions in an inverse:  There's the

23   liability and then the damages phase.

24        And again, although dicta, the Court said that

25   the Gutierrez opinion does not explain the basis

1    upon which the County was held responsible for the

2    developer's drainage system or for the failure of

3    this review process to catch the fill material at

4    issue.  So they did not follow that, the Gutierrez

5    case, in the Modern case.

6         Also, plaintiffs have cited to Jacksonville v.

7    Schumann as one of their cases supporting the

8    inverse case.  And, Your Honor, this apparently was

9    a case where the City of Jacksonville owned the

10   airport.  They obtained permits for expansion of

11   the airport which, in turn, increased the noise.

12        But what's important here is the airport,

13   again, was owned and operated by the City of

14   Jacksonville, so they were exercising, if you will,

15   operational-type functions, not planning-type

16   functions.  And the City took action which, in

17   fact, caused the taking.

18        So Your Honor, we don't believe that in this

19   case they have asserted an inverse condemnation

20   claim against the District.  And we believe that

21   the claim should be dismissed against the District

22   for these reasons.

23        A more minor, we have also asserted that they

24   have failed to attach the environmental resource

25   permit, and they have failed to attach the

1   December 18, 2018, letter.

2       Again, under Florida Rules of Civil Procedure

3   1.130, they -- you're supposed to attach any

4   documents upon which a defense could be made.  And

5   the permit clearly is a document upon which a

6   defense could be raised, since they are asserting

7   an inverse condemnation claim, and that has the

8   date of issuance and the date of expiration on it.

9       So Your Honor, for these reasons, we believe

10  that all of the counts against the District, which

11  are Counts 5, 7 and 8, should be dismissed and that

12  Count 5 should be dismissed against Mr. Armstrong.

13      THE COURT:  Is Count 5 the only one that

14  includes Mr. Armstrong?

15      MS. ARENAS-BATTLES:  Yes, ma'am.

16      THE COURT:  Thank you.  Response?

17      MR. SOUTHRON:  Thank you, Your Honor.  The

18  first thing I want to point out, and this is

19  similar to what we discussed with Dade City, is

20  that the water management district is not the

21  Southwest Florida permit agency.  They are, in

22  fact, the water management district.

23      And even though we are asking them to review

24  the permit, the basis and theory of their liability

25  is not predicated upon the permit, in and of

1    itself.  It is predicated upon their

2    responsibility, under statute, to manage water

3    throughout the state of Florida.

4         Now, this is one of those areas where if I

5    may, Your Honor, I'm going to reference our third

6    amended complaint, as I discussed earlier.  Our

7    second amended complaint requests a hearing, and

8    we've discussed the case law earlier in the real

9    estate case, real estate agent where mandamus can

10   be an appropriate remedy to request a hearing.

11        What we've done in our third amended complaint

12   is we've elaborated significantly on what

13   non-discretionary, in other words, mandatory

14   responsibilities that we think the water management

15   district has, and particularly in this case.

16        So first I want to go to Florida Statute

17   737.016 [sic], and I'm just going to walk through

18   this white binder.  I want to discuss what the

19   policy is from the Florida legislature and why we

20   have water management districts at all.

21        THE COURT:  What tab is it in your --

22        MR. SOUTHRON:  In your binder, Your Honor, the

23   front tab has them all separated, so it's 737.016.

24        THE COURT:  All mine are 373s.

25        MR. SOUTHRON:  You don't have 016?  373 --

1    THE COURT:  Oh, 373.  Not 737.  Yes.  It's

2    tab --

3        MR. SOUTHRON:  My apologies.

4        THE COURT:  Okay.  Now we're good.

5        MR. SOUTHRON:  So the policy and why we have

6    water management districts is such that the waters

7    in this state are among its basic natural

8    resources.  The legislature has further declared,

9    in sub 3, that -- now, throughout these statutes,

10   it will reference a department.  The department has

11   delegated this to the districts.  I don't think

12   that's in dispute, so I'm not going to go through

13   the statute where it says that.

14       But it says, "It is the policy of the

15   Legislature:  To provide for the management of

16   water and related land resources; to promote the

17   conservation, replenishment, recapture,

18   enhancement, development, and proper utilization of

19   surface and groundwater."

20       Sub(d), "To promote the availability of

21   sufficient water for all existing and future

22   reasonable-beneficial uses."

23       Sub(e), "To prevent damage from floods, soil

24   erosion, and excessive drainage."

25       Sub(f), "To minimize the degradation of water

1    resources caused by the discharge of stormwater."

2         And sub(j), "Otherwise to promote the health,

3    safety, and general welfare of the people of this

4    state."

5         So I go through these basic policy

6    declarations because I think it's relevant, as I go

7    through the remaining statutes, what the purpose

8    is.  And that can help us understand, if the

9    statute doesn't say it explicitly, whether

10   something is discretionary or mandatory.

11        So next I'm going to go to Statute 136 --

12   373.136.  What this statute does, it says, under

13   sub 3, that "Any action by a citizen of the state

14   to seek judicial enforcement of any of the

15   provisions of this chapter shall be governed by the

16   Florida Environmental Protection Act."

17        This statute actually is enforceable by

18   private citizens.  It does explicitly give us a

19   private cause of action to enforce any violations

20   of the water statutes.

21        I want to go to 373.423.  So again, consistent

22   with our argument that they're not simply a

23   permitting agency, the statute actually requires

24   the water management district to actively inspect

25   projects.  All right?

1      So it says, under sub 1, (as read) "During the

2   construction or alteration of any stormwater

3   management system, the governing board or

4   department" must -- "shall make at its own expense

5   periodic inspections as it deems necessary to

6   ensure conformity with the approved plans and

7   specifications included in the permit."

8      Sub 2, (as read), "If during the construction

9   the governing board or department finds that the

10   work is not being done in accordance with the plans

11   and specifications indicated in the permit, it

12   shall give the permittee written notice.  It shall

13   order immediate compliance with such plans and

14   specifications.  The failure to act in accordance

15   with the orders of the board or department after

16   receipt of that notice shall result in the

17   initiation of revocation proceedings in accordance

18   with 373.429."  All right?

19      So this is essentially what we're asking the

20   mandamus.  Now, the factual record shows that there

21   was inspections, but we're saying we want you to

22   have that proceeding, and if the outcome is

23   discretionary, then the outcome is discretionary.

24   But we want the proceeding to happen.

25      MS. ARENAS-BATTLES:  Your Honor, I'm going to

1    object to his argument on this, because under

2    373.136, and he's specifically referring to

3    subsection 3, it -- where it says "Any action by a

4    citizen of the state to seek judicial enforcement

5    of any of the provisions of this chapter shall be

6    governed by the Florida Environmental Protection

7    Act, 403.412."  There are 403.412 actions that can

8    be brought.  He has not brought a 403.412 action.

9        MR. SOUTHRON:  Your Honor, if I may, that is

10   in my argument, and I will give to that.

11       MS. ARENAS-BATTLES:  Your Honor, I mean, this

12   is a moving target.  We come in, and it's not

13   limited to the four corners of their complaint.

14   They are constantly bringing in new causes of

15   action under new statutory provisions, such as 163

16   today, now 403.412.  We're supposed to be limited

17   on the motion to dismiss to the four corners of

18   this complaint.

19       MR. SOUTHRON:  Your Honor, defense counsel is

20   correct.  It is not in the second amended

21   complaint.  We have listed these bases in the third

22   amended complaint; however, I do want to point out

23   that the basis of the cause of action is writ of

24   mandamus, and that is a constitutional remedy.  It

25   is not, in fact, the statutes.  It's the courts

1    have the power to issue writs.

2        MS. ARENAS-BATTLES:  Pursuant to 403.412, Your

3    Honor, and if he brings that type of cause of

4    action, then he can argue this provision.  And I'm

5    not sure that's even successful then, but it's not

6    applicable in this proceeding, which is a motion to

7    dismiss the second amended complaint.

8        THE COURT:  All right.  Go ahead then.

9        MR. SOUTHRON:  Okay.  Sub 3, Your Honor, it

10   says, (as read) "Upon completion of the work, the

11   executive director of the district or the

12   Department of Environmental Protection shall have

13   periodic inspections made of permitted stormwater

14   management systems to protect the public health and

15   safety and the natural resources of the state."  It

16   doesn't sound discretionary to me.

17       I'm going to proceed to 433.  This statute

18   says, (as read) "Any stormwater management system,

19   dam, impoundment, reservoir, et cetera, that

20   violates the laws of this state or violates the

21   standards of the governing board shall be declared

22   a public nuisance."

23       Now, we didn't point this out in the second

24   amended complaint, but in our third amended, we

25   have requested that they do that, to declare this

1   project a public nuisance.

2         (As read) "The operation of such stormwater

3   management system, et cetera, may be enjoined by

4   suit by the state or agency or by a private

5   citizen."  So again, a second statutory right to a

6   private cause of action, which we are seeking here

7   and we have filed for injunction.  But through the

8   writ of mandamus, we're also seeking to enjoin the

9   further digging of the project.

10        Finally, (as read) "The governing board" may

11   be -- "shall be a necessary party to any such

12   suit."  So they have to be here.  They're a

13   necessary party.

14        All right.  Going to Statute 436, this

15   provision discusses what may happen after an

16   inspection.  It says, (as read) "Upon completion of

17   any inspection provided for by 423, the executive

18   director or the department shall determine what

19   alterations or repairs are necessary and order that

20   they be made in a reasonable time.

21        (As read) "The owner of such stormwater

22   management system, et cetera, may file a written

23   petition for a hearing no later than 14 days after

24   that order is final, the owner -- if the owner

25   shall fail to make the alterations or repairs, the

1 governing board may, in its discretion, cause them

2 to be made."

3      So this -- this is an example of what we've

4 been discussing all morning, which is that the

5 outcome of certain remedies may be discretionary,

6 but the process and the procedure for conducting

7 them is not.

8      And finally, I want to discuss 439, Emergency

9 Measures.  Sub 1, (as read) "The executive

10 director, with the concurrence of the board, shall

11 immediately employ any remedial measures to protect

12 life and property if:  Sub 1(a) the condition of

13 any stormwater management system is so dangerous to

14 the safety of life or property as to not permit

15 time for the issuance and enforcement of an order

16 relative to the maintenance or operation."

17      Or sub(b), (as read) "Passing or imminent

18 floods threaten the safety of any stormwater

19 management system."  Well, that's precisely what

20 we've been alleging, Your Honor.

21      MR. SCARRITT:  Can I interrupt you to ask:

22 Are you citing from this notebook or something

23 else?

24      MR. SOUTHRON:  Yes.

25      MR. SCARRITT:  So 439 and 436 are in here?

```
 1              THE COURT:  Statute 373.439.
 2              MR. SCARRITT:  Thank you.
 3              MR. SOUTHRON:  You should be on Tab 7.
 4              THE COURT:  And just for my clarification,
 5       didn't I -- didn't I hear Ms. Battles indicate that
 6       everything was in compliance of the permit?
 7              MS. ARENAS-BATTLES:  Your Honor, we believe
 8       the permit is in compliance, yes.  They're -- in
 9       fact -- and, again, this is outside the complaint.
10       We have -- upon their request, we have sent staff
11       out to the property who have -- did initially find
12       some problems on the property.  They asked that
13       they be corrected.  Some have been corrected, Your
14       Honor.  We believe the permit is in compliance
15       today, yes.
16              THE COURT:  Okay.  Go ahead.
17              MR. SOUTHRON:  Your Honor, we believe the
18       permit is not in compliance.  We've alleged that in
19       the complaint.
20              MS. ARENAS-BATTLES:  But again --
21              MR. SOUTHRON:  As -- Your Honor, if I may --
22              THE COURT:  Go ahead.
23              MR. SOUTHRON:  The defense counsel stated what
24       the permit said, "a mining operation with a future
25       subdivision."  Well, there is no subdivision.  Now
```

1        this is outside of the complaint, but our experts

2        will testify that you couldn't give this land away

3        for free.

4              MR. QUAM:  Objection, Your Honor.  Counsel is

5        giving expert testimony in a motion to dismiss

6        hearing.

7              THE COURT:  Yeah.  Sustained.

8              MR. SOUTHRON:  We've alleged in the complaint

9        that too much dirt has been taken off of the land.

10       We can no longer build a subdivision.  Now, it's

11       common to mine dirt for a subdivision.  What is not

12       common is to dig all the way down to clay, which

13       we've alleged in the complaint.

14             MS. ARENAS-BATTLES:  Objection, Your Honor.

15       He's, again, testifying.  This is becoming an

16       evidentiary hearing versus a motion to dismiss.

17             THE COURT:  Sustained.  Move along.

18             MR. SOUTHRON:  Well, we don't think that the

19       permit is compliant.

20             THE COURT:  Okay.

21             MR. SOUTHRON:  With regards to the statute of

22       limitations -- and I apologize.  I've been looking.

23       I don't have the case law on point for this --

24       statute of limitations is not appropriate grounds

25       for a motion to dismiss when there are material

1    facts at issue as to when the tolling began.

2         I think with the factual complexity, we have a

3    14-year-long record.  We've alleged that the

4    tollings begun in 2018.  For all causes of action

5    and in a motion to dismiss hearing, it's our

6    position that that has to be taken as true, within

7    the four corners of the complaint.

8         They can file that as an affirmative defense.

9    They can file a motion for summary judgment.  Both

10   sides can present evidence and argument, and that

11   can be handled very quickly after, but not in a

12   motion to dismiss hearing.

13        And I want to discuss the Tony's Roasted Red

14   Pepper case.  Your Honor, we believe the reason

15   Judge Barbas's non-controlling opinion was cited

16   here is because there's simply no court in the

17   State of Florida that agrees with SWFWMD's position

18   on Statute 373.617.

19        In fact, from reading the order in that case,

20   it's not clear that Judge Barbas agreed either.  He

21   did not issue a written opinion, and the order

22   doesn't state the reasons or the grounds for

23   dismissal.  So, unfortunately, we have no way to

24   argue this case.

25        Defense counsel also pointed out that this is

1     a unique situation regarding a third-party inverse
2     condemnation claim.  We don't think it's unique.
3     We think that Gutierrez is the controlling opinion.
4     This has happened before.  It's gone to the DCA.

5          Now, I think I remember we had conversations
6     with the defendants about this case.  One of the
7     reasons we may know about this case, and they were
8     not able to find it, is because my co-counsel here
9     actually argued that case at the trial court level.
10    But in any case, we think that that case is
11    controlling.

12         The Modern opinion, I've just received this
13    today.  It's not been cited in any briefs.  That's
14    okay.  We think that the Modern court distinguished
15    Gutierrez the same way that I would, and it says,
16    on page 10, it looks like the second paragraph, it
17    just says, "The Gutierrez opinion does not explain
18    the basis the County was held responsible for the
19    drainage system.  Contrary to Modern's argument,
20    the opinion does not even apply.  This
21    responsibility was based upon the issuance and
22    approval of discretionary permits."

23         We're not arguing that either.  Permits are
24    involved in this case.  It's not the basis for the
25    cause of action.

1      Finally, we also think this is not unique that
2  a third party could be affected by government
3  actions taken on another party's property.  The
4  Jacksonville case says -- and this happens quite
5  often.  There's all sorts of nuisances and problems
6  that can result from permanent government activity
7  on somebody else's property that damages or affects
8  your property, and that is a ground for inverse
9  condemnation.
10     So, Your Honor, what we would like to request
11  is that you deny the defendant's motion to dismiss.
12  Alternatively, if it is granted, we'd ask for leave
13  to amend to make any required corrections.  Thank
14  you.
15     MS. ARENAS-BATTLES:  Your Honor, may I briefly
16  respond?
17     THE COURT:  It's your motion.  You may.
18     MS. ARENAS-BATTLES:  Your Honor, he cited to
19  numerous sections of other statutes that would
20  still -- such as 403, 402, that would still require
21  the governing board to determine that they needed
22  to go in and enforce the permit, which, again,
23  requires a determination.  It is not a ministerial
24  act.  It requires a discretionary function of the
25  government.  It's not appropriate for a writ of

1    mandamus.

2          As to -- I keep hearing now, which is news,

3    that the permit is not at issue here.  So the fact

4    that it was issued in 2006, that it's continuing,

5    or the -- now it's the enforcement or the failure

6    to enforce in the action.  In their complaint,

7    under, for example, the writ of mandamus, found

8    at -- they're asking, at 121, "Petitioning for a

9    writ of mandamus compelling SWFWMD and Armstrong to

10   review, via public hearing under Florida Statute

11   373.429, Summit View's environmental resource

12   permit."

13         In the allegations of their complaint, all the

14   way through it's been the permit.  Suddenly now

15   it's -- well, it's other activities or the failure

16   to enforce.

17         Your Honor, what is it we're supposed to

18   enforce?  We have a permit.  Our agency has

19   determined there's no reason to enforce at this

20   time, and they apparently think there is, but that

21   is not the basis of their complaint.  That's not

22   what they've alleged in this complaint.  It's

23   constantly come out of the issuance of the permit.

24         And as to the allegations that are continuing,

25   when you look at their complaint, in paragraphs --

1    let me see if I can find my notes quickly -- the

2    allegations in paragraphs 23 through 78, which are

3    the actions from 2006 to 2018, are all events

4    described in the complaint that relate to the City

5    of Dade City and not to SWFWMD.

6         So suddenly we're -- they're saying that their

7    complaint has all these activities that relate to

8    the issuance of our permit or the failure to

9    enforce our permit post 2006, that's just not what

10   their complaint shows.  All the allegations are

11   against the City, not us.

12        Your Honor, what they're basically asking,

13   under the writ, is that this Court tell an agency,

14   an executive section -- or executive branch of

15   government, when it needs to enforce its permits.

16   There's -- there's a separation of powers doctored

17   for a reason.

18        THE COURT:  I was going to say.  I'm smart

19   like that.  Can't I just tell --

20        MS. ARENAS-BATTLES:  And I wouldn't suggest

21   otherwise, Your Honor.

22        THE COURT:  No.  I'm only kidding.

23        MS. ARENAS-BATTLES:  But that's what they're

24   asking you to do here today, under this writ of

25   mandamus.

1    MR. SOUTHRON:  Your Honor, if I could make two

2    quick points.

3         THE COURT:  She gets the last word.  It's

4    their motion.

5         MR. SOUTHRON:  Fair enough.  Our argument on

6    the permit is that it's continuing until 2019.  Our

7    third amended complaint does cite Statute 403.412,

8    and --

9         THE COURT:  As the basis for what?

10        MR. SOUTHRON:  That's the Environmental

11   Protection Act.

12        THE COURT:  Right.  Under what theory?  For

13   the writ?

14        MR. SOUTHRON:  Yes.  Yes.  It's not in the

15   second amended complaint.  It's in the third.

16        MS. ARENAS-BATTLES:  Which is not at issue

17   here today.

18        MR. SOUTHRON:  And I don't think there's a

19   separation of power issue, because the statute

20   gives private citizens a cause of action.

21        MS. ARENAS-BATTLES:  And Your Honor, if I --

22   again, under 403.412, which is not what they have

23   brought, and that's a separate issue.

24        THE COURT:  All right.  All right.  Let's move

25   on.

1       MR. QUAM:  Thank you, Your Honor.  I'm Darrin

2   Quam on behalf of Summit View, LLC.  I filed a

3   motion to dismiss the second amended complaint.

4   There are four claims asserted against Summit View.

5       THE COURT:  Are you the last one or are there

6   more?

7       MR. JOHNSTON:  Your Honor, mine are going to

8   be very similar to Mr. Quam's, so it won't be --

9       MR. QUAM:  And I'll be brief, Your Honor.

10  Mine is the thin white notebook that we provided.

11  There's four claims asserted against Summit View,

12  LLC:  The first is Count 1, fraudulent inducement;

13  Count 2 for negligence; and then there's Counts 9

14  and 10, which are depravation of lateral support.

15  That's one for damages and one for injunction.

16      And I think, Your Honor, it's a flavor for how

17  the claims, even though we're 14 months into this

18  case, that they're winding around, and new statutes

19  and theories are being raised at the motion to

20  dismiss hearing.  So if I may, I'd like to just

21  hand out a copy of the complaint, because I'd like

22  to stick to the four corners.  And I -- here's an

23  excerpt of the second amended complaint, so we know

24  exactly what we're talking about here.

25      And it just kind of got glossed over in all

1          the legal argument with the other two motions, but
2          what happened here?  Is this a situation where
3          there's a cave-in or anything like that?  That's
4          not alleged in the complaint, Your Honor.
5                And if you look at paragraph 2, what it says
6          is that the slope "is so steep and so near the
7          Denlingers' property that it destabilizes granular
8          soils with the potential of causing soil from the
9          Denlingers' land to slide into the Summit View's
10         pit."  That's their word.
11               So what we talk about here is it's a
12         potential, no -- they don't allege that anything
13         has slid into the pit yet.  There's no cave-in.
14         They don't have pictures of disaster situation.
15         And then that's just one word.
16               Why don't we go back to paragraph 96, the
17         exact same thing, "The potential of causing soil
18         from the Denlingers' land to slide in."  Twice.
19         Let's go for three.  How about paragraph 115, "The
20         potential for causing land to slide into the pit."
21         Fourth time's a charm?  Yes.  Paragraph 172, "it
22         has the potential."
23               So we're not even in a situation where they
24         have any damages yet.  They're complaining, and
25         they -- in their opening statement they

1    mentioned -- what are they complaining about?  The

2    aesthetics.  They don't like the way it looks.

3         Well, that's not -- we're not here on that,

4    Your Honor.  And the first comment they make is

5    a -- is their fraudulent inducement claim.  And

6    again, I want to stick to the complaint, because

7    what their -- what their complaint alleges is that

8    "Summit View represented that it intended to

9    develop a residential subdivision," that's their

10   quote, in the future, and that, as a result of

11   that, the Denlingers didn't object to the rezoning

12   from single-family residential to the planned-unit

13   development that was approved.

14        So that's their -- that's their argument.  And

15   what I've handed up to Your Honor after those pages

16   is their count for fraudulent inducement, Count 1,

17   and it's one page.  And it says that, in

18   paragraph 81, the specific one, (as read) "Summit

19   View made a material misrepresentation by

20   representing it intended to use the property to

21   develop a subdivision.  This constituted the basis

22   for the rezoning notice, and inform their decision

23   to object or not to the rezoning."

24        So this is what the fraudulent claim against

25   the -- the fraudulent inducement claim is against

1    Summit View.  It's not about extensions or anything

2    like that, Your Honor.  We're talking about

3    January 2006.  Okay?

4        So can someone bring a claim for fraudulent

5    inducement based on what someone intends to do in

6    the future?  Well, the Florida law is clear on

7    that, Your Honor.

8        At Tab 5 in our white binder, we have the

9    Second District case of Brod v. Jernigan, and in

10   that case, they set out to black letter law that

11   fraud cannot be -- it's on page 5 of that Brod

12   case, "Fraud cannot be predicated on statements

13   which are promissory in their nature, or constitute

14   expressions of intention, and an actionable

15   representation cannot consist of mere broken

16   promises, unfulfilled predictions or expectations,

17   or erroneous conjectures as to future events, even

18   if there is no excuse for failure to keep the

19   promise, and even though a party acted in reliance

20   on such promise or not, is the mere nonperformance

21   of a promise... establishing fraud or lack of

22   intent to perform."

23       So that's the black letter law.  And that's

24   their allegation, literally, in paragraph 81, the

25   misrepresentation is:  You intended to build a

1    residential subdivision in the future, and the

2    black letter law is that you can't have fraud for

3    intent.

4         And the case at Tab 4 is on Biscayne

5    Investment Group v. Guarantee Management.  In that

6    case, the claim for fraudulent inducement based on

7    a promise to act in the future was dismissed and

8    affirmed.

9         And on page 4, the quote -- the Court

10   specifically says, "In the instant case, the

11   plaintiffs made no specific allegations of

12   misrepresentation of material facts.  At most, the

13   plaintiffs alleged a mere promise not performed,

14   which, by itself, cannot form the predicate for

15   actionable fraud."  So on that basis alone, Your

16   Honor, Count 1 should be dismissed.

17        But if you look at the rest of the complaint,

18   there are allegations that he had no intent --

19   Summit View had no intent, back in January of 2006,

20   to build a residential subdivision.  Well, that's

21   actually contradicted by their own allegations,

22   because in paragraphs 30, 48, 49, 51, they allege

23   that Summit View went through all the things to get

24   it to go forward.  It got permits.  It got

25   approvals.  It entered agreements, all in

1    furtherance of the subdivision.

2         And then the plaintiffs even admit that, you

3    know what probably caused some problems was the

4    Great Recession.  The Great Recession hindered the

5    development.  That's in paragraphs 56 and 67.  So

6    basically the allegations are that there was an

7    alleged intent to -- misrepresentation of intent in

8    2006 to rezone the property, to get rezoned.  Then

9    2007, 2008, they took affirmative steps towards the

10   subdivision, and then 2009 and 2013, the Great

11   Recession, it slowed down -- development slowed

12   down.

13        But in the absence of any allegation that

14   Summit View intended not to perform at the date of

15   the 2006 misrepresentations alleged, there's no

16   fraud claim.  And Your Honor, look at paragraph 81.

17   It doesn't say that.  It just says -- it doesn't

18   say that there was no intent to perform.

19        And, in fact, the allegations in the complaint

20   that I just read to you are different than that,

21   say the opposite.  The fraudulent claim should also

22   be dismissed, because as you know under Robertson

23   and the Florida Rules of Civil Procedure, fraud is

24   a serious claim and must be pled with specificity.

25        They don't allege how their reliance caused an

1    injury.  There's nothing in there that says what

2    they would have done back in January 2006 at a

3    public hearing to stop the rezoning from single

4    family to a PUD.

5         What -- you have to identify what was their

6    specific objection that was going to be so

7    meritorious that was going to stop this from

8    happening?  They don't do that.  So it should be

9    dismissed on that ground.

10        And then, finally, on the fraud claim, the

11   most obvious thing is the statute of limitations.

12   This misrepresentation occurred in January 2006,

13   allegedly.  And remember what the allegation says.

14   It says, "A material misrepresentation that

15   constituted the basis," and that caused them not to

16   object at the rezoning hearing in January 2006.

17        So for years, then years after that -- it's in

18   their complaint.  For years afterward, they just

19   sit and watch.  Truckload of truckload being taken

20   off.  2.2 million cubic yards of dirt taken off.

21        And if I can hand Your Honor another excerpt

22   of the complaint, just one page, and this goes to

23   their argument that somehow the statute didn't

24   start running in 2006, when they didn't object to

25   the rezoning, because in paragraphs 37 through 39

1    they say that "over 2 million cubic yards of dirt

2    is conspicuous."  It's "obvious."  It's "fully

3    incompatible."  And get this, it says, "Despite the

4    alarming signal by Summit View."

5        So for the last 12 years, Summit View have

6    been removing dirt from the property, from its 135

7    acres.  It's obvious, conspicuous, open, all done

8    according to permits, which are public documents,

9    and any due diligence you can get, and somehow the

10    statute of limitations didn't run until 2018 is

11    incredulous and against Florida law, Your Honor.

12        Their claim, expressly in their paragraphs 81,

13    84, especially -- specifically accrued in

14    January of 2006.  It's way beyond the four-year

15    statute of limitations that's in the Statute 95.11.

16        So by the time they got around to filing this

17    complaint in April 2018, it was too late and barred

18    by the statute.  And, Your Honor, they -- and I'm

19    anticipating they're going to be talking -- they

20    just want to amend some more, but they're not going

21    to be able to amend the fraud count, because

22    counsel knows that Summit View has a signed

23    contract with a national builder to build houses on

24    that property.  So they're not going to be able to

25    amend it to allege something contrary to that to

1     say that there was never any intention and now

2     Summit View has a contract.

3          Count 2 is their negligence count.  That ties

4     in with the allegations that I showed Your Honor

5     about potential.  Your Honor knows that you decide

6     actual cases.  You don't decide potential cases.

7     The paragraphs that I read about potentials in

8     paragraphs 2, 96, 115, 172.

9          And, Your Honor, we have the case that

10    supports us:  It's at Tab 19, the Taylor Imported

11    Motors v. Smiley.  In that case, the Second

12    District affirmed the dismissal of a claim for

13    uncertain damages.  And on page 2, it specifically

14    says, "The damages cannot properly include

15    compensation for injuries which are remote from the

16    wrongful act or which are of an uncertain or a

17    speculative character."

18         So Your Honor, we have the negligence claim,

19    as counsel mentioned, the elements are duty,

20    causation, breach and damages.  And here, they

21    can't have that.  They don't have damages.  They're

22    talking about potential.  There's a potential that

23    this could slide in.  Well, anything's possible,

24    but that's not what this Court decides.  So they

25    have not alleged damages.  And on that ground, the

 1    negligence claim should be dismissed.

 2         On Counts 9 and 10, those are the counts for

 3    depravation of lateral support, and those are

 4    common law counts.  And there are very few --

 5    little case law in Florida on that point, but so it

 6    seems like counsel and I both agree that the best

 7    place to look is the restatement of second of

 8    torts, which is at Tab 21 of our binder.

 9         And that says basically, just so Your Honor

10    knows what the elements of this unusual tort is, as

11    probably you haven't heard about since property

12    class, first year:  "One who withdraws the

13    naturally necessary lateral support of land in

14    another's possession or support that has been

15    substituted for the naturally necessary support, is

16    subject to liability for a subsidence of the land

17    of the other that was naturally dependent upon the

18    support withdrawn."

19         So you can imagine that's a situation where if

20    someone digs out a basement at the property line

21    and causes their neighboring property to cave in,

22    there's a tort for that.  That's what this is --

23    this is going after.

24         And the Maryland case that is in -- that's

25    also been cited, I believe, in the opposition

1          response from the plaintiffs, Levi v. Schwartz,
2          also cites this -- the comment.  On page 5 of -- so
3          we're at Tab 21, and the restatement Tab 21,
4          page 5, the comment "I," which is "liability is for
5          subsidence."  So we've already -- they can't allege
6          a claim for subsidence or for this, Your Honor,
7          because we're already clear that it's all
8          potential.  Nothing's happened yet.
9               So on that ground alone, there's no
10         depravation of lateral support, because
11         everything's potential, but the restatement itself
12         specifically says that to make the act reliable,
13         the subsidence must be substantial.
14              The rule that the law will not concern itself
15         with trifles is applicable.  And there's no
16         allegation in the complaint of subsidence.  There's
17         certainly no allegation in the complaint that there
18         was substantial subsidence.
19              So what we have here is a potential for soil
20         sliding into.  That's not enough for a count.  On
21         that ground alone, Counts 9 and 10 should be
22         dismissed.
23              We're also finally on this -- as with -- I
24         sound like an echo, but the complaint's very vague
25         on when things happened.  So -- so there's no way

1    that the -- the defendant can tell when this

2    alleged subsidence occurred, other than it's

3    potential, and it hasn't happened yet.

4         Finally, besides the counts themselves, Your

5    Honor, there are two minor points or two other

6    points.  One is for punitive damages.  They allege

7    punitive damages against Summit View.  They have

8    not asked the Court's leave for that.  Under the

9    Florida Statute 768.72, the plaintiff is absolutely

10   required to get court approval before filing a

11   claim for punitive damages.

12        And in Tab 7 of our white binder, the Cypress

13   Aviation case, that Court reversed the denial or

14   dismissal of unauthorized punitive damage claim and

15   said, "As the Supreme Court succinctly stated in

16   Simeon:  To comply with Section 768.72's

17   requirements, a plaintiff must obtain leave from

18   the trial court to amend the complaint before

19   punitive damages" --

20        THE COURT:  Mr. Quam.

21        MR. QUAM:  Yes.

22        THE COURT:  I'm well aware of all of that.  I

23   didn't see a claim for punitives.  Is it in here

24   somewhere --

25        MR. QUAM:  Yes, Your Honor.

```
 1                THE COURT:  -- in the complaint?

 2           MR. QUAM:  Yes.

 3                THE COURT:  Can you direct me there?

 4           MR. QUAM:  I believe at the end of Count 1,

 5      they ask for exemplary damages, Your Honor.

 6                THE COURT:  Oh, I see.  Okay.

 7           MR. QUAM:  On page 17.

 8                THE COURT:  Yep.  I must have missed that.

 9           MR. QUAM:  And then, finally, I don't know if

10      they're still pursuing this, but the plaintiffs

11      have asserted four common law claims against Summit

12      View, LLC, and they've also asserted a demand for

13      attorneys' fees.  There's no contract alleged.

14      There's no statute alleged.  We ask that the

15      attorneys' fees motion -- demand for attorneys'

16      fees be stricken.

17           So, Your Honor, we ask that -- in short, we

18      ask that the motion to dismiss be granted with

19      prejudice.  They can't amend without leave to

20      amend.  We ask that their motion for punitive

21      damages to be dismissed, and we ask that the

22      attorneys' fees demand be stricken.

23                THE COURT:  Okay.  Response?

24           MR. SOUTHRON:  Your Honor, I want to start by

25      referring to Defendant Summit View's motion, where
```

1    they state the elements of a fraudulent inducement

2    action.  It's paragraph 7.  One is a false

3    statement; two, knowledge by the person making that

4    statement; three, with the intention -- the intent

5    by the person making the statement that the

6    representation will induce another act on it; and

7    four, reliance.  We've pled those elements.

8        A few things were pointed out with regard to

9    whether or not this was, in fact, a

10   misrepresentation.  We've alleged in the complaint

11   sufficient facts to show that the idea that a

12   subdivision was going to be built was, in fact, a

13   misrepresentation.  It is not when they very

14   blatantly said, "I'm taking 2.2 million yards of

15   dirt."  That wasn't misrepresentation.  That was

16   actually true.

17       What was a misrepresentation was that we're

18   going to then build a subdivision on top of clay

19   after that dirt is removed.  That's our allegation.

20       As far as that being a promise, we're alleging

21   that it was not a promise.  It was a

22   misrepresentation.  And we acknowledge the case law

23   saying a promise unfulfilled cannot, in fact, be

24   fraud, but we're not saying it was a promise.

25   We're saying that -- so we would like to present

1    evidence and prove that it was never a promise in

2    the first place.

3        THE COURT:  What would you call it?

4        MR. SOUTHRON:  I would call it fraud.

5        THE COURT:  Okay.  Then let's cut to the

6    chase.  I -- I agree your -- I tend to believe that

7    some of the case law and the elements seem to be a

8    little convoluted or, you know, seem to say --

9    identify the same thing yet with different

10   outcomes.  So rather than me going through that

11   huge analysis, what about the statute of

12   limitations?

13       MR. SOUTHRON:  The statute of limitations for

14   fraud does not begin to run until the person is

15   aware they've become defrauded.  We did not become

16   aware that a subdivision was not going to be built

17   until 2018 when the zoning was reverted by Dade

18   City.

19       THE COURT:  What about Mr. Quam's argument

20   that in your own paragraphs, you indicate that it's

21   clear and obvious, even from the beginning, because

22   you were arguing that they shouldn't have issued --

23   it should have been a huge red flag when they

24   applied for a permit seeking 2.2 million cubic

25   yards?

1      MR. SOUTHRON:  We're saying it should have

2  been obvious to the City.  It should have been

3  obvious to the District what that meant.  But to

4  the neighbors, they would have no idea what that

5  meant.

6      THE COURT:  So this pit, as you call it,

7  suddenly appeared in 2018?

8      MR. SOUTHRON:  Well, it took years and years

9  and years to dig.  But even today, the defendant

10  still says, "We're going to build a subdivision."

11  All right?  So -- and our argument is sometimes the

12  most deceptive thing is an obvious fact.  What we

13  think is obvious is there's never going to be a

14  subdivision on that property.

15      THE COURT:  Okay.

16      MR. SOUTHRON:  If they did, we would settle

17  this case today.  We just don't think it's going to

18  happen, and we think it was fraud.

19      THE COURT:  Okay.

20      MR. SOUTHRON:  Now, as far as the lateral

21  support claims, we did not allege substantial

22  subsidence.  That's a Maryland case.  We've alleged

23  that, at the border between the Happy Hill property

24  and the Denlinger property, there's now a 40-foot

25  cliff.

1    The cliff does not have to cave in in order to

2    lose your lateral support.  The concept of lateral

3    support is such that missing support on the right

4    means you no longer have good footing on the left.

5    Now, it may or may not cave in, but you certainly

6    cannot depend that it won't.

7    And that deprives the Denlinger property of

8    its most beneficial economic use, and that is

9    building a subdivision on the Denlinger property.

10   That is now impossible.  It is an engineering feat

11   that cannot happen.

12   Furthermore, we have alleged a water taking.

13   Prior to the mining on Happy Hill, Happy Hill was

14   the tallest property in Dade City at that place.

15   The top of that hill was taken off, and then

16   another 40 feet has gone down, so the Denlingers

17   have lost an enormous amount of rainwater runoff

18   onto their land that they had previously enjoyed.

19   So it's not just the lateral support, but it's also

20   the water taking, the damages of losing that

21   stormwater.

22   I do want to point out, with regard to the

23   statute of limitations, that Dade City filed a

24   lawsuit in 2018 -- I think that is correct --

25   making all the same allegations.  The statute of

1    limitations was not an issue presumably.

2         MR. SCARRITT:  Judge, would you like a

3    one-hour report on that --

4         THE COURT:  No.

5         MR. SCARRITT:  -- litigation?  Because if he

6    wants to talk about that, I feel like I have to

7    give you a complete picture.

8         THE COURT:  That's okay.

9         MS. ARENAS-BATTLES:  Your Honor, I'm going to

10   object to -- he keeps referring to water rights.

11   There's no allegation in this complaint that they

12   have a water use permit, and so I'm not sure what

13   the allegation is regarding water rights.

14        THE COURT:  You mean the Denlingers' --

15        MS. ARENAS-BATTLES:  Yes, Your Honor.

16        THE COURT:  -- permits?  Okay.

17        MS. ARENAS-BATTLES:  There's nothing in this

18   complaint that states they have a water use permit

19   on that property.

20        THE COURT:  Okay.  I agree I haven't seen

21   that.  So let's -- that will be sustained.  We

22   don't need to talk about that any further --

23        MR. SOUTHRON:  Okay.

24        THE COURT:  -- since it's not in the complaint

25   anywhere about water, as far as the Denlingers'

1    rights to water.

2         MR. SOUTHRON:  Well, they have a right to

3    rainwater, natural rainwater runoff.

4         THE COURT:  Yeah.  I mean rain that falls on

5    their property, I guess, would be considered their

6    water at the moment, but we're not getting into --

7         MR. SOUTHRON:  Okay.

8         THE COURT:  There's nothing in the complaint

9    about the washout, you know, that somehow the pit

10   is sucking all the water.  I haven't seen that.

11   Right?  It's not in there.

12        MR. QUAM:  Right, Your Honor.

13        THE COURT:  Okay.  Then let's just move on.

14        MR. SOUTHRON:  Okay.  Well, in conclusion,

15   Your Honor, we don't think that the damages -- even

16   aside from the water, are mere trifles.  We think

17   to live next to a 40-foot cliff is not a trifle.

18   We think to have the economic value of your

19   property deprived is not a trifle, and we think

20   living next to a strip mine is not a trifle.  So we

21   would ask Your Honor to not grant the motion to

22   dismiss.

23        With regard to the attorneys' fees and the

24   punitive damages, we remove them in the third

25   amended complaint.  We don't dispute the removal of

1     those at this time.

2          THE COURT:  Okay.  All right.  Response,

3     rebuttal?

4          MR. QUAM:  I have nothing, Your Honor.

5          THE COURT:  All right.  So that was Count 9 of

6     the subsidence depravation --

7          MR. QUAM:  Nine and ten.

8          THE COURT:  -- and injunctive relief.  Okay.

9     Did you argue the injunctive relief?

10          MR. QUAM:  It's the same analysis, Your Honor.

11          THE COURT:  Okay.  All right.  Who's next?

12          MR. JOHNSTON:  I'll be very brief, Your Honor.

13     Darryl Johnston on behalf of Keene Services.  Keene

14     Services is an independent contractor to Summit

15     View that was -- been on the property not prior to

16     2013.  We are parties to Counts 9 and 10, which

17     Mr. Quam just argued about, and I'm going to

18     basically rely upon those same arguments.  Much of

19     that is what's contained in my motion.

20          The only thing that I would ask Your Honor is

21     if this is going to be repled at some point in

22     time, there needs to be some allegation about when

23     this depravation of lateral support, if they state

24     a cause of action, when it occurred.

25          Because if it occurred back in 2008, my folks

1     haven't been there in 2008, so it would be helpful

2     for me to allege defenses to know the timing of

3     that sort of thing.

4          With regard to Count 4, which is the

5     negligence count which my client has been sued

6     upon, my big question:  There's no allegations that

7     the excavation by my client was not consistent with

8     the Dade City Code.  There's no allegations that

9     the excavation was outside applicable setbacks,

10    that the slopes on the walls are not consistent

11    with whatever the Code provided, or that it is

12    otherwise inconsistent with the excavation permit.

13         Now, granted, I think there is likely a duty

14    to comply with the code requirements of the Dade

15    City Code with regard to this excavation and

16    certainly any other permits that have been issued

17    on the property, but without knowing what has been

18    violated and just a blanket statement that Keene

19    Services caused damage, without specifying what

20    that is, we believe that it's insufficient and the

21    case should be dismissed.

22         As Mr. Quam also mentioned, there is no

23    allegation of damages.  The paragraphs that he

24    mentioned that had this potential for soil erosion

25    and includes my client both in paragraphs 2 and

1  115, and it's -- it's clear that the potential for

2  causing soil to be removed from a neighboring

3  property is a whole lot different than a cave-in, a

4  collapse, or something that actually has happened.

5      That's why we don't think it states a cause of

6  action, because the element of damage is just not

7  present for the negligence claim.

8      They have already stated they're withdrawing

9  the attorneys' fee request from the others, so I

10  assume that's going to be applicable to mine as

11  well, and that's all I have.  Thank you, Judge.

12      THE COURT:  Thank you, Mr. Johnston.

13      MR. SOUTHRON:  Your Honor, if I can be equally

14  brief in responding.  The allegations that counsel

15  has said we did not make, we did make in

16  paragraphs 111 and 112, where we state that they

17  did not follow the construction plans as

18  specifications for the project.

19      The crux of this is that the 40-foot pit that

20  exists on the north side of the Happy Hill property

21  was not in the construction plans, was not in the

22  plans that were submitted to be built.  That was

23  something that was done later.

24      I will state that we do not know the entire

25  time line as to when it was 5 feet and then 15 and

1    then 35 and then 40, but what we do know that the

2    public, the neighbors, including our client,

3    looking at the plans for the subdivision, never

4    expected to see a 40-foot pit.

5        And if there could be a subdivision built

6    there, there's still -- you could put dirt back,

7    but if the property's left the way it is now,

8    that's not according to plan, and we think that

9    Keene was negligent in continuing to dig in that

10   manner.

11       THE COURT:  All right.  Who else?

12       MS. UBEROI:  Your Honor, my name is Barbara

13   Uberoi.  I represent FDC.  We are the civil

14   engineer.

15       THE COURT:  Florida Design.  Okay.

16       MS. UBEROI:  Sorry about that.  We were just

17   brought in and wanted to see if you have any

18   questions regarding that.

19       And the second thing is I wanted to let you

20   know, as Mr. Quam had brought it up and it is issue

21   of the complaint and it has been brought up, that

22   FDC can confirm that there are negotiations, and

23   they are with the Lennar contract, and FDC is

24   working on the feasibility plan.  This, should the

25   Court --

1          MR. SOUTHRON:  Objection, Your Honor.  I think

2     this is outside the scope of the motion before the

3     Court.

4          MS. UBEROI:  Well, my point is, is that

5     plaintiffs have said that they would be very, very

6     happy to settle at this point in time if they were

7     going to develop the claim.  We're in the process,

8     Your Honor, should the Court decide to allow the

9     further proceedings go on, that is an issue that's

10    going to develop.

11         THE COURT:  Thank you.

12         MR. SOUTHRON:  If I may just respond briefly.

13         THE COURT:  Yeah.

14         MR. SOUTHRON:  We've asked to be a part of

15    that process and to see anything that would prove

16    that Lennar was actually going to buy this

17    property, and nothing has been provided.

18         THE COURT:  All right.  FDC did not file, as

19    yet, a motion to dismiss?

20         MS. UBEROI:  That's correct, Your Honor.  We

21    have a professional liability claim that's separate

22    and distinct.

23         THE COURT:  Okay.  Thank you.  All right.  So

24    that's everybody?  All right.  Then I'll go in the

25    order that we started.  With Mr. Scarritt's motion,

1    the motion to strike as far as the attorneys' fees

2    request, that was agreed upon, right?  And wasn't

3    there something else?

4        MR. SCARRITT:  On the motion to strike?  That

5    was it.

6        THE COURT:  Okay.  All right.  As to Count 6,

7    a writ of mandamus against the City, I will -- I'm

8    going to dismiss that with prejudice.  There is no

9    clear legal right, no -- and it's absolutely

10   discretionary.  There's no way that plaintiff can

11   plead otherwise, period.

12       And the case law is very clear about you can't

13   use a writ and the proceedings in a writ to decide

14   whether there's a clear legal right.  All of the

15   cases cited are clearly on point with regard to the

16   two requirements:  Clear legal right and

17   non-discretionary.

18       No way in any -- any fashion or any possible

19   stretch of the word "discretionary" would issuing

20   permits and that whole process be considered

21   ministerial.  It is absolutely discretionary.  So

22   no.  No mandamus as to the City.  So that was Count

23   Number 6, I believe, against the City.

24       And Number 7, inverse condemnation.  Let's

25   see.  All right.  The inverse condemnation appears

1    to be based on the issuance of the 2006 permit

2    through both the City and the District.  And

3    Statute 373.617 sub paren 2 clearly indicates the

4    time for raising an issue with that is 90 days.

5         And I'm -- I don't see how we can get -- I

6    don't see how that could -- even if it was

7    something to do with the permit in 2018, I'm going

8    to -- I've got to dismiss that, but I'll do that

9    one without, because there's some -- there may be

10   some possibility of resurrecting that.

11        I'm not -- my mind is trying to envision any

12   possible set of facts, but I've got a lot to think

13   about here, so I'm -- out of an abundance of

14   caution, I'm going to dismiss that without.  And

15   that's Count 7 is both SWFWMD and Dade City, and so

16   that's as to both.

17        And oh, and Count 6 that I dismissed with

18   prejudice, that's as to Dade City and Sherman.

19        All right.  And then the negligence is the

20   last one against Dade City, I believe.  There

21   again, several reasons that has to be dismissed

22   and, quite frankly, this -- I've got a significant

23   statute of limitations issue, but clearly the

24   notice -- the conditions precedent were not

25   complied with under 768.

1        The negligence, I'm not -- I don't know how --

2    again, the actions of the City arose from the 2006

3    deals and permits.  I don't know how you're going

4    to resurrect a statute of limitations argument or,

5    you know, overcome.

6        Let's see.  All right.  So plaintiff argues

7    that the cause accrued in 2018, when the City

8    revoked the permits, zoning reverts back to Ag.

9    I'm going to deny that, once again, without, as

10   to -- let's see.  Is that both? -- yeah.  Count 8

11   is City and District.

12       The District, I'm going to do with prejudice

13   as to Count 8.  There's a lot of statutory guidance

14   as to that.  It's sovereign immunity and otherwise.

15   It -- it's pretty clear.  Where is this?  Oh, here

16   it is.  373.443 specifically says "state or

17   district."  It doesn't say it includes city in that

18   one; otherwise, I would have said city, too, with

19   prejudice.  So that's why -- that's 373.443 kills

20   the County as to SWFWMD.  So that's with prejudice

21   as to SWFWMD.

22       And as to -- what's the other ones?

23       MS. ARENAS-BATTLES:  We have Count 5, writ of

24   mandamus.

25       THE COURT:  Did I cover all of the City's?

1          MR. SCARRITT:  No, Your Honor.  I'm still
2     waiting on Count 8.  You said that it was
3     dismissed, and then --
4          THE COURT:  I'm going to do Count 8, as to the
5     City, without.  There's some -- they've pled -- you
6     did plead that it was accrued in 2018 or did you
7     just argue that?
8          MR. SCARRITT:  Argued.
9          THE COURT:  All right.  So that's why I'm
10     going to dismiss it without.  We definitely need
11     more specific time indicators in amended.  All
12     right.  So 8 is without prejudice to City, and with
13     prejudice to SWFWMD.
14          So is that it on City?
15          MR. SCARRITT:  It is, Your Honor.
16          THE COURT:  And SWFWMD?
17          MS. ARENAS-BATTLES:  We have Count 5, the writ
18     of mandamus.
19          THE COURT:  Oh, okay.
20          MS. ARENAS-BATTLES:  You ruled as to the City.
21          THE COURT:  The same as City, dismiss with.
22          MS. ARENAS-BATTLES:  As to both the District
23     and Mr. Armstrong?
24          THE COURT:  Yes.
25          MS. ARENAS-BATTLES:  Thank you, Your Honor.

1          THE COURT:  All right.  So you two are done.

2          Then Summit View.  All right.  So again, the

3     statute of limitations, there's -- the fraudulent

4     inducement I'm going to dismiss with prejudice.

5     There's just no way you're going to get that.

6          Negligence, I don't know what count that is.

7          MR. QUAM:  Count 2.

8          THE COURT:  Okay.  I thought that was right.

9     I had it written as two, but I didn't think that

10     was right.

11          You don't -- you fail to state a cause of

12     action as to damages, so I'm going to dismiss

13     without.  And the punitive request for exemplary

14     and attorneys' fees are stricken.

15          Count 9, as to Summit View, I'm going to

16     dismiss without.  Let's see.  Oh.  Well, that's a

17     funky common law deal, and I'm just not overly

18     convinced either way.  I'm going to do nine and ten

19     without, a dismiss without.  And that's as to

20     Summit View and Keene, on those two counts.

21          As to Count 10 and 9 on Keene, if those counts

22     are repled, got to have more specific time because

23     they may be with prejudice too, depending on the

24     facts.

25          All right.  And lastly, I think the only thing

1    left is four, as to Keene.  I'll have to dismiss

2    that without.  No damage is sufficiently pled, and

3    also much more specific facts as to time.

4         All right.  Now, who's going to do the orders?

5    Prevailings?

6         MR. SCARRITT:  We'll be glad to do that.

7         THE COURT:  All right.  Get together and get

8    that done.  As to the leave to amend, I'm going to

9    say, because I dismissed without prejudice, you do

10   have leave to amend not later than 60 days.

11        MR. JOHNSTON:  Your Honor?

12        THE COURT:  Yes.

13        MR. JOHNSTON:  Is there a way to be a little

14   less than 60 days?  I mean, you know, a typical

15   complaint, and I think they've already got the

16   third probably close to being done anyway, can we

17   ask for 30 or 20 or something like that as opposed

18   to 60?  Just a request.

19        THE COURT:  Well, it is the third.  Yeah, that

20   seems fair.  Thirty days.

21        MR. SOUTHRON:  Your Honor, could we request

22   45?

23        THE COURT:  All right.  We'll split it in the

24   middle, in the interest of working together, 45

25   days.

1   MR. SOUTHRON:  Thank you.

2   MR. SCARRITT:  Your Honor, I just want to

3   clarify.  The motion to strike by the City was

4   conceded, so that's been granted?

5   THE COURT:  Correct.

6   MR. SCARRITT:  All right.  The other thing is

7   we have a hearing before Your Honor -- did you know

8   this? -- next week on the Valdez case, and, you

9   know, there are a lot of similar issues.  The last

10  thing I want to do is to postpone anything in this

11  case, but I'm wondering if we had your order done

12  so that we can kind of absorb it, that we might be

13  able to be better prepared for that hearing.  Just

14  a thought --

15  THE COURT:  Well, we all sat through all the

16  arguments, so I think we all know what to expect,

17  and, you know, I'm not going to -- I try my

18  darndest, in every year that I've been sitting in

19  this seat, to make sure that I do things

20  consistently.  Hopefully they're right

21  consistently, but they will be consistent.

22  Typically, that's --

23  MR. SOUTHRON:  If I may, Your Honor, we would

24  consent to the same order being issued in the

25  Valdez case.

1          THE COURT:  Okay.  Super.

2          MR. SOUTHRON:  We believe the issues are so

3     similar --

4          THE COURT:  I would imagine they would have to

5     be, so -- I can't envision a separate set of facts.

6          MR. SOUTHRON:  We would like to request,

7     however, to preserve that hearing time to hear our

8     motion to consolidate.

9          THE COURT:  Okay.

10          MR. SOUTHRON:  You can object if you can't,

11     but I'd like to make use of the time on the

12     calendar.

13          MR. QUAM:  Your Honor, I'm not counsel for

14     Summit View in the Valdez case.  I'm not aware of

15     any motion to consolidate, so I don't have that on

16     my calendar.

17          MS. ARENAS-BATTLES:  I'm not either, Your

18     Honor, and I'll just -- the Valdez motion that we

19     did have was going to be handled by Mr. Fussell;

20     however, if there's a motion to consolidate, I will

21     not be available next Friday.

22          MR. SOUTHRON:  Okay.  If I may, instead, can

23     we preserve that time for a case management

24     conference to discuss --

25          MS. ARENAS-BATTLES:  Again, Your Honor, I'm

1    not available due to a medical procedure.

2        THE COURT:  So you weren't going to be there

3    anyway.

4        MS. ARENAS-BATTLES:  Again, on a case

5    management, typically the lead attorney, which is

6    me -- the motion to dismiss was going to be handled

7    by Mr. Fussell, so I would request that, you know,

8    if they want a case management, we reset it, and

9    we'll cooperate to have it as soon as possible.

10       THE COURT:  My calendar is very flexible.

11   Having two civil divisions in this courthouse is

12   pretty nice for my calendar, so fear not.  You

13   know, it won't be six months down the road.

14       MR. SOUTHRON:  We don't want to cause any

15   hardship --

16       THE COURT:  I can certainly hear things

17   expeditiously, and even if you need -- a couple

18   hours, as you-all know, is going to take -- a

19   little more difficult than fitting in 15 or 30

20   minutes, but it's still -- I'm certain I can fit

21   you in, in a reasonable fashion.

22       So if we're -- if the order is going to be

23   pretty much the same in the Valdez case, and we

24   don't need the full hearing time, I don't know how

25   you would be able to utilize it without, you know,

1       causing conflict with everyone.

2               MR. SOUTHRON:  Understood.

3               THE COURT:  But if you can work something out,

4       I'm here, so -- but I think we're good for today.

5               MR. SCARRITT:  So Your Honor, as I understand

6       it, because we'll have an actual order for the

7       Valdez case, there's not a need for the hearing.

8               THE COURT:  I don't see why there would be.

9               MR. SOUTHRON:  Correct.

10              MR. SCARRITT:  And because we're having

11      conflicts with trying to fill it up with something

12      else, we're going to reschedule that; is that

13      correct?

14              THE COURT:  Yeah.  More than likely, yeah.

15              MR. SCARRITT:  Judge, just I haven't ever done

16      an order for you.  Since each judge is a little

17      different, are you more of a bare bones judge or do

18      you want to have your words that you've said here

19      in the order?  How do you like it?

20              THE COURT:  Typically, in a hearing such as

21      this, some of the case cites would be great.  You

22      don't need my language, but just, you know, the

23      reliance that I indicated that were argued.  I

24      didn't rely on anything that wasn't argued.

25      Primarily, the statutes were really big in the

1    statute of limitations, obviously.  And I think
2    that's about it.
3         MR. SCARRITT:  Thank you, Your Honor.
4         THE COURT:  All right.  Yeah.  More bare bones
5    than not.
6         All right.  Any other matters we need to
7    address?
8         MR. SOUTHRON:  No, Your Honor.
9         MR. SCARRITT:  No, Your Honor.
10        THE COURT:  All right.  Thank you all.  See
11   you next time.
12        (Proceedings adjourned at 12:48 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

123

1           CERTIFICATE OF REPORTER

2

3        I, Lory A. Minio, Registered Professional

4   Reporter, do hereby certify that I was authorized to and

5   did report the foregoing proceedings, and that the

6   transcript, pages 1 through 122, is a true and correct

7   record of my stenographic notes.

8

9        Dated this 19th day of June 2019 at Dade City,

10  Pasco County, Florida.

11

12

13

14   _____
                 Lory A. Minio, RPR

15

16

17

18

19

20

21

22

23

24

25